**WHEELING–PITTSBURGH STEEL CORPORATION, Plaintiff, Counterdefendant,**

v.

**ALLIED TUBE & CONDUIT CORPORATION, Defendant, Counterplaintiff.**

**No. 74 C 3697.**

United States District Court, N.D. Illinois, E.D.

July 27, 1983.

**834**

Earl E. Pollock, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for plaintiff, counterdefendant.

Aram A. Hartunian, Hartunian, Futterman & Howard, Chtd., Chicago, Ill., for defendant, counterplaintiff.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

On September 17, 1975, the defendant-counterplaintiff Allied Tube & Conduit Corporation ("Allied") brought a three count counterclaim against the plaintiff-counterdefendant Wheeling-Pittsburgh Steel Corporation ("WP").[1] Count I of the counterclaim alleges violations of § 1 of the Sherman Act, 15 U.S.C. § 1. The Court has subject matter jurisdiction over Count I pursuant to 28 U.S.C. § 1331. Counts II and III allege that WP violated the Illinois Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, § 312, and Allied's rights under the Illinois common law. Allied urges the Court to assert subject matter jurisdiction over Counts II and III by virtue of the doctrine of pendent jurisdiction.

---

1. WP's complaint against Allied was dismissed by court order on October 3, 1978.

In Count I, Allied alleges that WP conspired with unnamed co-conspirators for the purpose of restraining trade and commerce in the electrical metallic conduit industry. Allied claims that WP conspired to prevent, hinder, and delay the adoption of an Allied product by the National Fire Protection Association ("NFPA"), and that the conspiracy was also intended to prevent, hinder and delay the acceptance by Underwriters Laboratories ("UL") of this Allied product. Allied claims that as a result of this conspiracy, its product received approval by the NFPA and UL four months later than should have been the case, thereby delaying Allied's entry into the market and causing it to suffer damages.

WP now moves for summary judgment on Count I on the basis of the *Noerr-Pennington* doctrine. WP argues that its opposition to Allied's product took the form of lobbying NFPA and UL, which is protected by the *Noerr-Pennington* doctrine and therefore not prohibited by the Sherman Act. In support of its motion, WP has relied on Allied's representations and certain stipulations entered into by the parties. In a recent statement to the Court, Allied agreed that the facts are not in dispute for purposes of the motion and the question before the Court is a legal one (Allied's Response of July 13, 1983, at 1). For the reasons given below, WP's motion for summary judgment is granted.

## I. FACTS

The NFPA is an independent voluntary membership organization. Its *raison d'etre* is to protect life and property from harm by fire. It attempts to accomplish this by developing, publishing and disseminating model public safety standards such as the National Electrical Code ("NEC"), which sets forth safety standards for electrical installations. The NFPA has a number of committees which review proposed changes to the NEC. Proposals which survive the various committees' work are submitted to the full NFPA membership at its tri-annual convention, and if approved there the proposals become part of the NEC.

UL is a private corporation which tests proposed products and specifications to determine whether they are safe. UL provides two basic services (relevant to the issues raised in this litigation). First, it will develop a set of specifications called a "product standard" for a new product. This product standard is industrywide, and it is by these specifications that each competitor's product is measured. Second, UL will test a particular product to determine whether it is safe. If UL finds a manufacturer's product to be safe, it will allow the manufacturer to attach a UL "label" to its product and will "list" that manufacturer as an approved manufacturer of the particular product.

Many states and cities have adopted building codes which govern the type of electrical equipment that may be used in local construction. The enforcement code authorities often rely on the testing and standards of the NFPA and UL. Frequently, the approval of NFPA and UL is incorporated into state and municipal codes.[2] Allied and WP agree that it is imperative that a firm wishing to market a new type of electrical equipment on a wide scale obtain the approval of NFPA and UL.

Electrical metallic conduit is a product used to house electrical wiring. Prior to

**2.** *See, e.g.,* Baltimore, Building Code § 8050 (1975); Chicago, Municipal Code § 87–100 (1971); Seattle, Electrical Code 100 (1974); District of Columbia, Rules and Regulations, Title 5B–2, § 110–35 (1972); Pittsburgh, Building Code Ch. 42, § 4204; Wisconsin Adm Code 1 E10.11 (1972). The following governmental entities also explicitly adopt and/or refer to the NFPA and/or UL standards: Dade County, Florida; Dallas; Denver; Detroit; Georgia; Houston; Newark; Phoenix.

In a case pending in United States District Court for the Southern District of New York, *Indian Head, Inc. v. Allied Tube & Conduit Corp. and National Fire Protection Association,* 81 Civ. 6250, Allied has observed that 40 states and well over 100 of the largest cities have adopted the NEC promulgated by the NFPA (Allied Memorandum of Law, March 21, 1983, at 5–6).

1974, two types of electrical metal conduit dominated the industry. Rigid metal conduit ("rigid"), known as heavy wall, is used primarily in industrial and commercial construction, and is manufactured on a continuous butt weld ("CBW") mill. CBW mills are very expensive to acquire and are owned by few companies in the United States besides WP. EMT, known as thinwall, is the other kind of conduit which was in common use prior to 1974. EMT is used primarily in residential construction and can be manufactured on an electrical resistance weld ("ERW") mill. While there are few CBW mills, there are hundreds of ERW mills.

In January, 1972, Allied began developing a third kind of electrical metallic conduit which it eventually called intermediate metallic conduit ("IMC"). The development of IMC apparently would have been a breakthrough in the electrical metallic conduit industry, since IMC had the potential to become a substitute for rigid. IMC is lighter in weight than rigid, would cost less to manufacture, and could be sold at a lower price. Furthermore, the IMC proposed by Allied could not be manufactured on a CBW mill, but could be manufactured by firms with ERW mills. Since IMC could be produced by many manufacturers in the industry, competition in producing electrical metallic conduit (rigid and IMC) for use in industrial and commercial construction would be increased. If IMC were to be accepted by the industry, manufacturers of rigid (including WP) would likely lose rigid business to the manufacturers of IMC.

In order successfully to market IMC, Allied had to get the approval of the NFPA (through adoption in the NEC) of its new product, and also had to secure UL's approval of IMC. By February, 1974, an NFPA committee approved Allied's proposed IMC for submission to the full membership at the NFPA convention set for May, 1974. Simultaneously, Allied was seeking the approval of UL for its new product. On April 16, 1974, UL issued a bulletin containing particular wall specifications of IMC recommended by a UL working group.

WP and other members of the conduit industry criticized on safety grounds the wall thickness specifications of IMC contained in UL's April 16th bulletin. Allied alleges (and for this motion it is taken as true) that during the NFPA convention of May 20–24, 1974, WP and its cohorts threatened to oppose the adoption of IMC on the floor of the NFPA convention unless UL agreed to hold further meetings as to the specifications. UL agreed to hold such meetings, and WP did not engage in a floor fight at the NFPA convention. Allied's proposal was adopted by the NFPA at its May, 1974 convention.

Allied had previously sent its proposed IMC product standard to UL and on June 18, 1974, WP sent its version of a proposed IMC product to UL. A meeting was convened on June 21, 1974, to discuss the two proposed IMC standards under consideration by UL (that is, the proposals by Allied and by WP). Three representatives of Allied attended this meeting, as did two representatives of WP. Allied fought for the adoption of its proposed standard, and WP fought for the adoption of the standard proposed by it. WP objected to Allied's proposal on safety grounds, stating that the walls of IMC as proposed by Allied were too thin.

On October 23, 1974, UL issued a bulletin containing the "requirements" for IMC. A UL employee (Mr. Bartholf) testified in his deposition that UL investigated WP's safety arguments regarding Allied's proposal, but found no support for WP's contentions. However, it is undisputed that the October 23, 1974, bulletin issued by UL explicitly states: "A number of suggestions were made relating to dimensional and weight specifications for this type of Intermediate Metal Conduit and a slight change minimum wall thickness has been made.... With the increase in wall thickness mentioned above ..." Thus the requirements adopted by UL contained thicker wall specifications than had been suggested by Allied. The changes made tended in the direction espoused by WP.

UL invited submittals for IMC by conduit manufacturers for listing in accordance with the requirements set forth in its October 23, 1974 bulletin. On November 6, 1974, Allied received an IMC listing from UL. Allied claims that this listing came approximately four months later than it would have had it not been for WP's objections to Allied's proposal. Therefore, Allied alleges it was deprived of four months time during which it could have marketed its IMC product.

## II. THE LEGAL ARGUMENTS

The basis for WP's motion for summary judgment is that it merely engaged in good faith and effective lobbying of NFPA and UL, both of which it describes as quasi-governmental agencies. WP argues that the *Noerr-Pennington* doctrine holds that the Sherman Act does not prohibit the kinds of activities in which WP engaged.

Allied maintains that *Noerr-Pennington* is inapplicable. First, Allied states that neither NFPA nor UL is a governmental agency of the kind contemplated by *Noerr-Pennington*. Second, Allied argues that even if WP's contacts with and approaches to NFPA and UL amounted to lobbying so-called governmental agencies and would otherwise be within the *Noerr-Pennington* protection, the facts of this case show that WP did not engage in genuine lobbying efforts, but that its activities were no more than a sham. Therefore, says Allied, the sham exception to the *Noerr-Pennington* doctrine is applicable here, and WP's motion should be denied.

## III. THE NOERR–PENNINGTON DOCTRINE

The Supreme Court has held that the Sherman Act does not prohibit certain kinds of joint lobbying activities "where their purpose is to influence government action. The doctrine arose from the need to construe the antitrust laws in such a way as to avoid a conflict with the right to petition the government protected under the First Amendment." *MCI Communications Corporation v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1153 (7th Cir.1983).

In *Eastern Railroad Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the defendant railroads were alleged to have conducted a publicity campaign against the trucking industry designed to foster the adoption and retention of laws destructive of the trucking business. The Court held that such activities were not prohibited by the Sherman Act regardless of the intent behind such activities, even if the plaintiff were able to prove that the defendants had an anti-competitive purpose. However, the Court suggested in dicta that "publicity campaigns" which were in fact "mere sham" attempts to interfere directly with the business relationships of a competitor were not outside the bounds of the Sherman Act. 365 U.S. at 144, 81 S.Ct. at 533.

The Supreme Court affirmed the *Noerr* principle in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Pennington*, an alleged conspiracy to restrain and monopolize trade in the coal industry, by a union and various coal companies engaging in joint lobbying of governmental agencies (including the Secretary of Labor and the Tennessee Valley Authority), was held to be outside the bounds of the Sherman Act. The Court stated: *"Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose."* 381 U.S. at 670, 85 S.Ct. at 1593.

In *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court reaffirmed the *Noerr-Pennington* principles in the context of efforts to influence the decisions of administrative and adjudicatory bodies. However, for the first time the Court held that the petitioning efforts in the case before the Court could be violations of the Sherman Act, in that the efforts had been designed to deny meaningful access to the adjudicatory tribunal, resulting in a usurpation of the decision-making process. Activities intended to "cor-

rupt the administrative or judicial processes", 404 U.S. at 513, 92 S.Ct. at 613, are not protected by the *Noerr-Pennington* doctrine and therefore may be prohibited by the Sherman Act.

Two legal questions are presented by WP's motion for summary judgment based on the *Noerr-Pennington* doctrine. First, are WP's activities with regard to NFPA and UL the equivalent of lobbying governmental entities? Second, if WP's activities would be protected by the *Noerr-Pennington* doctrine, does the sham exception to the doctrine apply here?

### a. *Lobbying Governmental Entities*

Allied argues that NFPA and UL are private bodies and that the *Noerr-Pennington* doctrine protects only the petitioning of governmental entities.

■ As noted above, numerous municipalities and states have adopted the standards set out by the NFPA in its NEC, and further have relied fully on testing procedures of independent laboratories such as UL, in promulgating their electrical code requirements. Such wholehearted reliance upon the NFPA and UL by these governmental entities has resulted in a near complete delegation of governmental authority to these otherwise private entities. While the governmental bodies of course have retained the power to modify or reject the NFPA and UL recommendations, in practice they have relied completely on them.

Allied itself has recognized this to be the case. In an antitrust action brought against Allied in the United States District Court for the Southern District of New York, *Indian Head, Inc. v. Allied Tube & Conduit Corp. and National Fire Protection Association,* 81 Civ. 6250, Allied has been charged with unlawfully conspiring with the NFPA to deny approval to Indian Head's proposal that plastic tubing be adopted in the 1981 version of the NEC. In *Indian Head,* Allied has claimed *Noerr-Pennington* protection on the basis that its actions before the NFPA constitute "valid lobbying activity designed to influence a governmental or quasi-governmental body"

(Allied's Answer to Complaint, filed on January 18, 1982, as quoted in WP's Memorandum in Support of Motion for Summary Judgment, at 3).

Further, the essence of Allied's antitrust counterclaim against WP in this case is that if NFPA or UL refused to approve a product, the government entities relying on NFPA and UL would necessarily also refuse to approve such products.

Finally, as a practical matter it would be virtually impossible for WP to lobby the individual municipalities and states regarding the adoption of particular specifications or requirements for IMC. These governmental bodies have placed total trust and reliance on NFPA and UL. In order to influence effectively the governmental entities, WP had no option but to lobby NFPA and UL.

■ Allied poses three arguments in an attempt to show that the *Noerr-Pennington* doctrine should not be applied on the facts of this case. First, it cites *Kurek v. Pleasure Driveway and Park District of Peoria,* 557 F.2d 580 (7th Cir.1977), *vacated and remanded,* 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *reconsidered and reinstated,* 583 F.2d 378 (7th Cir.1978), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979). *Kurek* stands for the proposition that the *Noerr-Pennington* doctrine does not apply where the governmental body acted "as a commercial entity." 557 F.2d 580, 592 at n. 10 (action under the Sherman Act would lie where defendant Park District demanded increased revenues from golf course concessionaires). *Kurek* is quite a different case from the one posed here, since the governmental entities involved are not claimed to have acted as commercial entities, but instead adopted product standards and specifications.

■ Second, Allied argues that "the *Noerr-Pennington* doctrine does not shield from the antitrust laws concerted efforts to influence decisions of government regarding the adoption of mere *specifications.* Such activities are not a crucial part of the

political process inherent in genuine efforts to influence significant policy decisions by the legislative or executive branches of government." (Memorandum of Allied in Opposition to WP's Motion for Summary Judgment, at 37–38; emphasis in original). This "political process" argument seems to be based on the theory that the First Amendment berth given the Sherman Act by the Supreme Court in the *Noerr* and *Pennington* cases relates only to questions of electoral politics. This is not the case. In fact, in *Noerr* itself the railroads were alleged to have vigorously lobbied the legislature to adopt and maintain certain weight standards for over-the-road truckers. 365 U.S. at 130, 81 S.Ct. at 525. This lobbying was allegedly motivated by a purpose to keep truckers out of the market for transporting goods. Clearly, the railroads sought legislation "regarding the adoption of mere specifications." *See also Israel v. Baxter Laboratories, Inc.*, 466 F.2d 272 (D.C.Cir.1972) (*Noerr-Pennington* doctrine applies to proceedings before the Food and Drug Administration relative to the approval of a particular drug).

■ Third, Allied argues that anti-competitive actions taken pending the passage of legislation are not protected by *Noerr-Pennington. See, e.g., Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 624 F.2d 476, 481–82 (4th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981) (joint action to challenge state law requiring insurance companies to pay benefits for psychological care protected by *Noerr-Pennington* doctrine; however, joint action to deny such benefits *pending* the legislative challenge is not protected). However, WP took no action pending the approval of IMC by NFPA and UL other than planning strategy in their efforts to approach (or lobby) NFPA and UL. Thus the teaching of *Virginia Academy* is inapplicable.

A number of cases hold that lobbying organizations much like NFPA and UL are protected by the *Noerr-Pennington* doctrine. The case which seems most directly on point is *Rush-Hampton Industries v.*

*Home Ventilating Inst.*, 419 F.Supp. 19 (M.D.Fla.1976). In *Rush-Hampton,* the plaintiff was engaged in the manufacture, distribution and sale of *ductless* bathroom fans. The defendant was a trade association composed of businesses manufacturing and/or selling *ducted* bathroom fans. The plaintiff sought the approval for its new product, ductless fans, from the three regional building code organizations whose primary functions were to promulgate model building codes and building standards for use by state and local entities. The defendant trade association was alleged to have organized and financed opposition to the plaintiff's new product by opposing the plaintiff's applications before the building code organizations, in violation of the antitrust laws. The court found that the approval by one of the building code organizations was "tantamount to approval by numerous governmental entities ... as the standards and products are often adopted by reference from those standards and products already reviewed by the organization." 419 F.Supp. at 22. The court held that the *Noerr-Pennington* doctrine protected the defendant's statements made to the building code organizations.

*Rush-Hampton* seems precisely on point. The only arguable distinction offered by Allied is that the building code organizations were composed in part of state and local building code officials, while this is not the case here. Therefore, Allied argues that the lobbying of the *Rush-Hampton* building code organizations is more closely tied to the traditional lobbying of governmental entities which the *Noerr-Pennington* doctrine was meant to protect. However, the fact that state and local building code officials were some of the members of these building code organizations is not a significant difference. Instead, the key factor is the nature of the relationship between the trade association and the governmental bodies. Because of the technical nature of the building code requirements, the approval by the organizations essentially became approval by the government. The great delegation of authority to the NFPA and UL by municipali-

ties and states in this case is equally deserving of *Noerr-Pennington* protection.

Another case supportive of WP's position is *Federal Prescription Service v. American Pharmaceutical Association*, 471 F.Supp. 126 (D.D.C.1979), *aff'd*, 663 F.2d 253, 262 n. 6 (D.C.Cir.1981), *cert. denied*, 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982). In *Federal Prescription*, the plaintiffs alleged the existence of a conspiracy to interfere with the business of mailing prescription drugs. The defendants were the National Association of Retail Druggists ("NARD") and the American Pharmaceutical Association. The plaintiff alleged that the defendants induced the American Medical Association ("AMA") to adopt a resolution opposing the dispensing of drugs by mail order houses. In addition, the defendants were alleged to have persuaded the Pharmaceutical Manufacturers Association ("PMA") to retract a statement favoring prescription drug advertising which PMA had made to the United States Department of Health, Education and Welfare ("HEW"). Judge Gesell granted the NARD's motion for summary judgment, stating that both the defendants' approaching the AMA and the activity relative to the PMA and HEW were protected by the *Noerr-Pennington* doctrine in that they "were at least indirect attempts to influence governmental behavior." 471 F.Supp. at 130.

The lobbying of the PMA to retract a statement it had made to the Department of HEW is a traditional kind of lobbying protected by *Noerr*. However, the lobbying of the AMA, clearly a non-governmental organization, was also found protected by *Noerr-Pennington*. *Federal Prescription* is not as strong a case as the one presented here, where the organizations approached by the defendants had their codes and standards specifically embraced by governmental units. The United States Court of Appeals for the District of Columbia Circuit affirmed Judge Gesell's dismiss-

al of the NARD for the reasons expressed in Judge Gesell's opinion. 663 F.2d 253, 262 n. 6.

Allied claims *United States v. Johns-Manville Corporation*, 259 F.Supp. 440 (E.D.Pa.1966), is directly on point on the issue at bar and favors its position. This civil antitrust action brought by the United States alleged a conspiracy in the asbestos-cement market. Part of the conspiracy alleged was the defendant's campaigning to promote the adoption by the American Society for Testing Materials ("ASTM") and the American Waterworks Association ("AWA"), as well as by municipal authorities, of restrictive specifications for the importation of foreign pipe. The district court held that these acts of the defendants were immune under the *Noerr-Pennington* doctrine.[3] 259 F.Supp. at 452–53. Thus this aspect of the *Johns-Manville* case seems to support WP rather than Allied, since "illegal" lobbying of governmental authorities found immune under *Noerr-Pennington* would be illegal lobbying of ASTM and AWA, unless they too were cloaked with the same kind of immunity.

However, without citing the *Noerr-Pennington* doctrine, the district court found that the defendant's acts relative to the adoption by the ASTM and the AWA of a requirement that all pipe be tested in the United States were not as a matter of law protected, and that this matter could not be disposed of on a motion for summary judgment. The court went on to say that there existed factual questions as to the motivation for attempting to exclude foreign pipe. 259 F.Supp. at 453–54.

These aspects of *Johns-Manville* are confusing. There seems to be no reasoned distinction to be made between the granting of summary judgment for certain approaches made by the defendant to the ASTM, the AWA, and local governmental authorities, but denying summary judgment for other similar approaches. Second, the court raised the question of the

---

**3.** The Court did not distinguish between the lobbying of public officials and the ASTM and AWA on this issue.

motivation of the defendant in seeking to exclude foreign pipe. However, the *Noerr-Pennington* doctrine specifically eschews the question of motivation or anti-competitive purpose. If good faith lobbying efforts were made, motivation and purpose are irrelevant. Insofar as *Johns-Manville* discusses and follows *Noerr-Pennington,* that case supports WP's position. Insofar as the result reached by that court does not cite or follow *Noerr-Pennington,* this Court declines to follow the result reached there.

Allied also cites *Feminist Women's Health Center v. Mohammad,* 586 F.2d 530 (5th Cir.1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979), for the proposition that lobbying a non-governmental organization is not protected by *Noerr-Pennington.* In *Feminist Women's Health Center,* the plaintiff alleged that the defendant doctors conspired to boycott the plaintiff's abortion clinic, and to fix the prices for abortions in the Tallahassee area. The district court granted the defendants' motion for summary judgment on the grounds that communications between the defendants and the Capitol Medical Society [4] were protected by *Noerr-Pennington.*

The Fifth Circuit reversed, holding that the district court was in error that the staff members at various hospitals and the Capitol Medical Society were "integral parts of the state's apparatus for regulating the practice of medicine." 586 F.2d at 543. The court held that the internal review responsibilities of hospital staffs and medical societies, which in some cases would require recommendations that disciplinary action be taken by the Florida Board of Medical Examiners ("BOME"), did not make medical review organizations public regulatory bodies. The Florida statute in issue gave the BOME discretion to follow or to choose not to follow the recommendations of a review board, and the court found BOME's discretionary latitude to be

key. The court expressly declined to address the question of whether the *Noerr-Pennington* doctrine would apply if the state statute mandated that the recommendations of medical review groups had to be followed by the BOME. 586 F.2d at 545 n. 13. Since that is precisely the question presented here—where state and local statutes explicitly incorporate the standards adopted by NFPA and UL—*Feminist Women's Health Center* sheds no light on the issue.

■ In sum, the Court finds that because of municipal and state authorities' reliance on NFPA and UL, the policy of the *Noerr-Pennington* doctrine is fulfilled by granting WP its protection in this case. WP presented its proposal to NFPA and UL as stand-ins for the municipal and state bodies which regulated these matters. And as in *Rush-Hampton,* approval by the NFPA and UL was "tantamount to approval by numerous government agencies," 419 F.Supp. at 22. In order to communicate its position to the powers that be in an effective way, WP had no choice but to approach NFPA and UL.

### b. The Sham Exception

■ However, Allied argues that even if the *Noerr-Pennington* doctrine can be extended to include WP's activities with regard to NFPA and UL, WP's "lobbying" was no more than a sham meant to delay the adoption of Allied's proposal by these organizations. The so-called "sham exception" to the *Noerr-Pennington* doctrine, initially enunciated in *Noerr* but first applied in *California Motor Transport,* has given rise to much case law interpretation and scholarly comment as well. *See, e.g.,* cases and articles cited in *MCI Communications Corp. v. American Telephone & Telegraph Co., supra,* 708 F.2d at 1154–55.

The first esoteric point of debate is whether the scope of the sham exception is different depending upon what kind of governmental entity is the subject of lobbying

---

**4.** The defendant doctors wrote to the Capitol Medical Society—a private organization of Tallahassee doctors—expressing the view that doctors should not associate with organizations (such as the plaintiff) which advertise their services. 586 F.2d at 537.

attempts. *California Motor Transport* seems to draw a distinction between lobbying the legislative or executive branches on the one hand and lobbying an adjudicative branch on the other. *See* 404 U.S. 508, at 513, 92 S.Ct. 609, at 613, 30 L.Ed.2d 642 (misrepresentations condoned in the political arena are not immunized when made in the adjudicatory process).

While some courts seem to have tried to get away from "labelling" the governmental body involved, *see, e.g., Federal Prescription Service, Inc. v. American Pharmaceutical Association, supra,* 663 F.2d 253, 266, and see n. 15 (D.C.Cir.1981), other courts, including our own Seventh Circuit in *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 225–28 (7th Cir.1975) (certain unethical conduct which would not result in antitrust illegality in legislative or other non-adjudicatory setting may not be protected under *Noerr-Pennington* if it takes place in an adjudicatory setting), have maintained that such distinctions are important.

Therefore, the Court must determine whether NFPA and UL were executive, legislative, or adjudicative-like bodies. Clearly, NFPA and UL did not act precisely in any of these capacities. They were neither elected nor appointed to their stations. But again, the *Rush-Hampton* case provides excellent guidance. In *Rush-Hampton,* the court found that the building code organizations performed functions that were both legislative (drafting model codes) and adjudicative (approving specific products) in nature, and in the end the court decided the building code organizations were quasi-administrative bodies. 419 F.Supp. at 24. Following the same analysis, this Court finds that the NFPA acted in a quasi-legislative capacity when it drafted a model code (the NEC). UL acted in two different capacities: first, in a quasi-legislative capacity when it adopted standards of general applicability; and second, in a

quasi-adjudicative capacity when it tested a particular manufacturer's products and agreed to "list" that particular product if it passed UL's tests. The fight between Allied and WP was over UL's adoption of standards of general applicability. Therefore, the lobbying of UL was in the context of UL's quasi-legislative activities.

In sum, the Court finds that the bodies lobbied by WP here acted in quasi-legislative capacities.[5] Therefore if there is a higher standard under the sham exception for the lobbying of an adjudicatory body, *cf. California Motor Transport with Metro Cable, supra,* that higher standard does not apply in this case.

In support of its sham exception argument, Allied alleges that WP made misrepresentations to UL as to the safety of Allied's proposed product (WP claimed that the walls of Allied's proposed IMC were too thin). First, the Court notes that the undisputed documentary evidence shows that UL did not adopt Allied's proposal without change, but found that the walls of IMC had to be slightly thicker. WP's complaints were not ineffective. Second, while deception and misrepresentation may be deemed unethical, nevertheless they are not the kinds of activity which come within the sham exception to the *Noerr-Pennington* doctrine. *See Metro Cable Co., supra,* 516 F.2d at 227–28; *see also Mark Aero, Inc. v. Trans World Airlines, Inc.,* 580 F.2d 288, 296–97 (8th Cir.1978).

The true meaning of the sham exception is that a defendant's lobbying activities may not be designed to deprive the opponent of access to the decision-making process. This is entirely consistent with the First Amendment context of *Noerr-Pennington,* which keeps alive the possibility of presenting various positions to governmental or governmental-like bodies for their consideration. However, if through a party's activities an opponent is denied ac-

---

**5.** *Rush-Hampton* adds to the labelling inquiry the term "quasi-administrative." Generally an administrative body acts pursuant to the orders of an executive, rather than the directives of the legislative branch. However, since the sham exception applies equally to the executive and legislative branches (though it may be different for an adjudicative body), the distinction between legislative and administrative is irrelevant here.

cess to the decision-making bodies, the process may break down. Actions aimed not "at securing favorable governmental action but at discouraging competitors from seeking governmental action," *Metro Cable Co., supra,* 516 F.2d at 232, come within the sham exception.

In *California Motor Transport,* the activity which came within the sham exception was the defendants' opposition to the plaintiffs' every application before the California Public Utilities Commission and the Interstate Commerce Commission, regardless of the merits. The alleged result "was that the machinery of the agencies and courts was effectively closed" to the plaintiffs. 404 U.S. at 511, 92 S.Ct. at 612.

The Seventh Circuit in *MCI Communications Corp. v. American Telephone & Telegraph, supra,* recently held that AT & T's filing of the same tariff with 49 individual state commissions, at a time when AT & T knew that the state commissions lacked jurisdiction over long distance interconnection matters, could bring the sham exception into play. The court noted the various ways in which MCI would be tied up by litigation before 49 separate regulatory agencies. Regardless of the results before the individual state regulatory agencies, MCI would be bled by the process of litigation itself. This is the kind of sham activity unprotected by *Noerr-Pennington. Cf. Bill Johnson's Restaurants, Inc. v. NLRB,* —— U.S. ——, ——, 103 S.Ct. 2161, 2169, 76 L.Ed.2d 277, 288 (1983) (*California Motor Transport* is a right of access case); *Havoco of America, Ltd. v. Hollobow,* 702 F.2d 643, 650 (7th Cir.1983) (First Amendment guarantees the right to attempt to enlist the government on the petitioner's side of the dispute; sham exception cannot be read so broadly as to chill the constitutional right).

Allied claims that it was denied access to UL's services. This assertion is totally without support in the record. Allied presented its proposal to UL, and was present at the key meeting of June 21, 1974, along with representatives of WP. Both argued vociferously that their propos-

als should be adopted. Four months later Allied won the battle, though its proposed ·product specifications had been slightly changed by UL. The fact that WP succeeded in convincing UL not to adopt Allied's proposed specifications *in toto* shows that WP's efforts to convince UL were genuine. The sham exception is inapplicable.

The Supreme Court's first and unanimous statement on the matter seems to describe this case as well:

[T]he true nature of [this] case [is] a "no-holds barred fight" between two industries both of which are seeking control of a profitable source of income. Inherent in such fights, which are commonplace in the halls of legislative bodies, is the possibility, and in many instances even the probability, that one group or the other will get hurt by the arguments that are made. In this particular instance, each group appears to have utilized all the political powers it could muster in an attempt to bring about the passage of laws that would help it or injure the other. But the contest itself appears to have been conducted along lines normally accepted in our political system, except to the extent that each group has deliberately deceived the public and public officials. And that deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned. That Act was not violated....

*Noerr, supra,* 365 U.S. 127, 144–45, 81 S.Ct. 523, 533, 5 L.Ed.2d 464. WP's motion for summary judgment on Count I is granted.

## IV. COUNTS II AND III

■ Counts II and III of Allied's counterclaim allege that WP's activities also violated the Illinois Deceptive Practices Act, Ill.Rev.Stat. ch. 121½, § 312, and the Illinois common law. Allied asks this Court to assert pendent jurisdiction over these state law claims. However, since the substantial federal antitrust claim is being dismissed at this time, the Court in its discretion dismisses Allied's state law

claims for lack of subject matter jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

The Court recognizes that this lawsuit is quite old. The Court also is aware that much of the evidence which Allied would present in support of its federal antitrust claim would be presented in connection with its state law claims in a state forum. The parties have represented to the Court that this action would be tried before a jury in a trial which would last between three and six weeks. The Court has a trial calendar crowded with claims over which the Court has subject matter jurisdiction. In light of this fact, and the fact that the claim over which the Court originally had jurisdiction is now being dismissed, the Court will dismiss the pendent state claims for lack of subject matter jurisdiction.

IT IS THEREFORE ORDERED that

(1) Plaintiff, counter-defendant Wheeling-Pittsburgh's motion for summary judgment on Count I of the counterclaim brought by Allied is granted.

(2) Counts II and III of Allied's counterclaim are dismissed for lack of subject matter jurisdiction.

(3) This action is dismissed.