INDIAN HEAD, INC.,
Plaintiff-Appellant,
Cross-Appellee,

v.

ALLIED TUBE & CONDUIT CORPO-
RATION, Defendant-Appellee,
Cross-Appellant.

Nos. 534, 735, Dockets 86–7734
and 86–7758.

United States Court of Appeals,
Second Circuit.

Argued Jan. 20, 1987.

Decided April 22, 1987.

Fredric W. Yerman, New York City
(Kaye Scholer, Fierman, Hays & Handler,
New York City, Michael Malina, Ira S.
Sacks, Randolph S. Sherman, Richard A.
De Sevo, Bert L. Slonim, Donna M. Gerber,
of counsel), for plaintiff-appellant, cross-ap-
pellee Indian Head, Inc.

Frank H. Wright, New York City (Grand
& Ostrow, New York City, Allison Man-
ning, Michael D. Rips; Lison & Barrett,
Chicago, Ill., John M. Lison, of counsel), for
defendant-appellee, cross-appellant Allied
Tube & Conduit Corp.

Robert D. Paul, General Counsel, Feder-
al Trade Com'n, Washington, D.C. (Ernest
J. Isenstadt, Asst. Gen. Counsel, Dean C.
Graybill, Michael Goldenberg, Attorneys,

Federal Trade Com'n, Washington, D.C., of counsel), as amicus curiae.

Douglas H. Ginsburg, Asst. Atty. Gen., Dept. of Justice, Washington, D.C. (W. Stephen Cannon, Deputy Asst. Atty. Gen., Catherine G. O'Sullivan, Marion L. Jetton, Attorneys, Dept. of Justice, Washington, D.C., of counsel), as amicus curiae.

Before LUMBARD, KEARSE, and PRATT, Circuit Judges.

LUMBARD, Circuit Judge:

This case requires us to decide whether federal antitrust laws apply to attempts to influence the promulgation of a code of safety standards by private industry. In its complaint, plaintiff Indian Head, Inc. (Carlon) charged that defendant Allied Tube & Conduit Corp. had conspired to prevent inclusion of Carlon's product in industry standards. The jury found for Carlon, and awarded it $3.8 million in damages (before trebling). Carlon now appeals from a judgment for defendant, notwithstanding the jury verdict, entered by Judge John E. Sprizzo in the Southern District on July 31, 1986. Judge Sprizzo reasoned that the doctrine developed in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), which protects petitioning of the government from Sherman Act scrutiny, also protects attempts to influence a private standard-setting organization where, as here, governments routinely incorporate that organization's standards into their legal codes. Allied cross-appeals, claiming that, as a matter of law, its conduct did not constitute an unreasonable restraint of trade. We vacate the judgment n.o.v. and remand with directions to reinstate the jury's award.

## I.

The evidence presented to the district court established the following: Carlon, a division of Indian Head, Inc., manufactures and sells flexible plastic electrical conduit made from polyvinyl chloride (PVC). Electrical conduit is hollow tubing used in building construction to carry insulated electrical wires through floors, walls, and ceilings, and outside buildings, and to protect the wires from damage or abuse. Carlon's product competes in the marketplace against steel conduit, of which Allied is the largest producer in the United States. Carlon claims that PVC conduit has a number of significant competitive advantages over steel conduit, including its pliability, its lower installed cost, and its lower susceptibility to short circuiting. On the other hand, as the district court instructed the jury, "there is a scientific basis for a concern about safety of PVC products with respect to toxicity.... the parties do not dispute that people disagree on the issue and there is an objective basis for a concern for safety." Allied particularly stresses the fact that, during fires in high-rise structures, PVC conduit may burn, emitting toxic smoke and fumes.

This case arises from Allied's efforts to block Carlon's proposal to include PVC conduit as a permissible type of electrical conduit in the 1981 edition of the National Electrical Code (NEC)—a model code, promulgated by the National Fire Protection Association (NFPA), which establishes product and performance requirements for electrical systems, including electrical conduit. The parties agree that NEC is the most widely disseminated and adopted model code in the world. The parties agree further that a substantial number of state and local governments adopt the NEC as law in whole or in part.[1]

---

1. A survey, conducted by Allied and submitted to the district court in the Post-Trial Affidavit of John Lison, Allied's Vice President and General Counsel, shows the extent of the governmental reliance upon the NEC as of June, 1982: Of the 51 jurisdictions surveyed (50 states and the District of Columbia), 26 adopted the NEC through the process of incorporation by reference, without changing a word; an additional 19 adopted the NEC with amendments; those jurisdictions which amended the NEC before adopting it on average changed only 12 of its 114 articles; none of the remaining six adopted their own electrical code. Allied's survey also included all cities over 100,000 and a select group of 450 cities whose population exceeded 25,000. 495

Every three years, the NFPA—a private, voluntary organization composed of over 31,500 individual and group members representing industry, labor, academia, insurance, organized medicine, firefighters, and government—revises the NEC through a multi-step, several-year-long process. The NFPA first submits proposed amendments to the NEC to a Code-Making Panel (CMP) made up of professionals with technical expertise in the area. In order to prevent domination by special interests, no more than one-third of any CMP's membership may represent a single interest. If approved by the CMP, a proposal then goes to the full membership, together with the comments and voting position of each CMP member. After the membership has had an opportunity to comment on the proposal, the CMP considers it a second time, along with the membership's comments. If again approved, the NFPA publishes the proposed amendment to the full membership. The entire membership then votes.

In 1980, when Carlon's proposal was being considered, a simple majority of those present at the annual meeting was sufficient to approve or reject a proposal. Disappointed members can appeal the membership's vote to NFPA's Standards Council and ultimately to its Board of Directors. Finally, NFPA rules also permit *de novo* review of a defeated proposal by the CMP, the Standards Council, and the Board of Directors, in a procedure known as a Tentative Interim Amendment (TIA). If adopted, a TIA includes or excludes a proposal on an interim basis until the next code cycle.

On September 18, 1978, Carlon began the process of obtaining NEC approval for PVC conduit by submitting its proposal, known as Article 331, to the NFPA, along with a fact-finding report by the Underwriters Laboratories. The NFPA directed the proposal to CMP-8, which initially rejected it. However, in December, 1979, based on further fact-finding and field demonstrations by Carlon, CMP-8 reversed its earlier decision and approved Article 331

for review by the full membership. The NFPA then scheduled the article for consideration by the full membership at the next annual meeting, to be held in Boston in May, 1980.

Recognizing that inclusion of PVC conduit in the NEC might adversely affect its sales of steel conduit, Allied's representatives met with a number of different groups, including other members of the steel industry, to gather votes in opposition to Article 331. On January 30, 1980, the Steel Rigid Conduit and Electrical Section of the National Electrical Manufacturers Association (NEMA) held a meeting to discuss the matter. At that meeting, and at a full meeting of the NEMA Steel Section held in February, everyone agreed to bring as many voters as possible to the upcoming NFPA meeting; Allied itself pledged to bring at least 100 people to vote against Article 331. Additional meetings and communications were held among the steel interests to coordinate their efforts to block Article 331's adoption. Acting within the letter of NFPA rules, Allied eventually arranged for 155 persons—including employees, sales agents, the agents' employees, company executives, employees of two of Allied's divisions, and the wife of the national sales director—to join the NFPA, to register as voting members, and to attend the annual meeting to vote against the proposal. Allied also paid over $100,000 for the membership, registration, and attendance expenses of these voters. The other steel interests similarly recruited and paid for the expenses of voters at the May, 1980 meeting. In total, the steel interests gathered 230 votes.

Carlon made no attempt to sign up additional employees or sales agents other than the four already scheduled to attend the meeting. Until about April 18, 1980, H.F. van der Voort, who coordinated Carlon's efforts to amend the NEC, apparently believed that the NFPA's rules did not permit a motion from the floor to return Article 331 to CMP-8. On or about April 18, van

cities responded, all with their own electrical code: 232 cities adopted the NEC exactly as written; 256 cities adopted the NEC and made

amendments to it, on average changing only 11 articles.

der Voort discovered that such a motion could, in fact, be made. By this time, Carlon could not have signed up additional members to vote at the May meeting; under NFPA rules, only those who have been NFPA members for at least 30 days could vote at an annual meeting. However, Carlon did solicit support from members of the Society of Plastics Industry, the NEMA plastics section, other members of the plastics industry, NFPA's railroad and health care sections, and the Fire Marshals Association of North America.

At the annual meeting, Allied instructed its personnel where to sit, based upon a detailed seating chart, and appointed group leaders to instruct the voters "how the discussion is progressing and how to vote." Boxed lunches were provided and the voters were told to "stay nailed to their seats" until the end of two evening sessions. Group leaders used walkie-talkies and hand signals to facilitate communication. Few of Allied's voters had any of the technical documentation necessary to follow the meeting; nor did any of them speak in opposition to Article 331 in the course of the meeting.

Two votes were taken on the motion to return Article 331 to CMP–8. The first, a voice vote, was inconclusive. The second, a standing vote, approved the motion by a vote of 394–390. To insure its victory, Allied insisted that its representatives remain in their seats until 2:00 a.m., when the NFPA membership voted to approve the entire NEC without Article 331. Carlon immediately appealed the decision of the membership to the Standards Council, which referred the appeal to the Board of Directors. Finding that the NFPA rules had been circumvented but not violated, the Board denied the appeal, and returned Article 331 to the CMP–8. In June, 1980, Car-

lon applied for a TIA including Article 331 in the 1981 NEC. After the proposed TIA wound its way through the various levels of the code-making process, encountering opposition by Allied at each step, a subcommittee of the Board of Directors found that Carlon's request was not sufficiently exigent to warrant issuance of the TIA.

Carlon commenced this action against Allied and the NFPA on October 9, 1981, alleging that they, the American Iron & Steel Institute, other steel conduit manufacturers, and Allied's independent sales agents had "combined and conspired to prevent competition from non-metallic tubing by excluding it from the 1981 NEC" by "subverting the consensual standards rules and procedures of the NFPA." [2] After extensive pretrial proceedings, a bifurcated trial commenced on March 4, 1985 before Hon. John E. Sprizzo and a jury. Prior to the submission of the liability issues to the jury, Allied conceded that it had a pecuniary or commercial interest in seeing that PVC conduit was not included in the NEC; Allied also admitted that it had agreed with the other steel companies to oppose Article 331.

After four days of deliberation, the jury returned its verdict and also answered specific interrogatories submitted by the court. The jury found that Allied's conduct subverted the consensus standard-making process of the NFPA, and constituted an unreasonable restraint of trade in violation of the antitrust laws. Judge Sprizzo then charged the jury on Carlon's theory that it was injured by the stigma of its exclusion from the 1981 NEC and Allied's marketing of that exclusion.[3] Relying upon these instructions, the jury found that "as a proximate result of Allied's unreasonable restraint of trade in violation of the antitrust laws," Carlon lost $3.8 million in profits.

**2.** Prior to trial, Carlon discontinued with prejudice its action against the NFPA.

**3.** Carlon alleged that the stigma of not obtaining NEC approval of its product and Allied's "marketing" of that stigma caused independent marketplace harm to Carlon in those jurisdictions permitting use of PVC conduit, as well as those which later adopted the 1984 NEC, which permitted use of PVC conduit in buildings less than

three stories high. It did not seek redress for any injury arising from the adoption of the NEC by the various governments. *See Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (state action doctrine). The district court instructed the jury accordingly. Allied does not challenge the correctness of, or the foundation for, the jury's computation of the damage resulting from that stigma.

Following the trial, Allied moved for a judgment n.o.v., or, alternatively, for a new trial. Allied claimed that the *Noerr-Pennington* doctrine and the first amendment barred entry of judgment in Carlon's favor and attacked on various grounds the court's charge and the jury's findings. Judge Sprizzo rejected the charge and jury findings challenges but held that the *Noerr-Pennington* doctrine required that the jury's verdict be set aside.

## II.

■ The *Noerr-Pennington* doctrine originated in a trilogy of Supreme Court cases. The Court first focused upon the tension between the first amendment and the Sherman Act in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). As part of an "economic life or death" struggle between the railroads and the emerging trucking industry over control of the long distance freight hauling market, the railroads began a deceptive publicity campaign designed to destroy the truckers' goodwill among their customers and the general public, and to advocate legislation that would hamper the trucking industry's ability to compete against the railroads. In a unanimous opinion authored by Justice Black, the Court reversed the judgment for the truckers, holding that Congress had not intended the Sherman Act to apply to "activities compris[ing] mere solicitation of governmental action with respect to the passage and enforcement of laws." *Id.* at 138, 81 S.Ct. at 530.

While noting the "essential dissimilarity" between joint efforts to seek legislation and "agreements traditionally condemned by § 1 of the Act," *id.* at 136, 81 S.Ct. at 529, the Court primarily feared that an expansive construction of the Act "would raise important constitutional questions" regarding the right to petition the government guaranteed by the first amendment. *Id.* at 138, 81 S.Ct. at 530. The Court refused to "lightly impute to Congress an intent to invade these freedoms," *id.*, especially because the legislative history of the

Act provided no basis for concluding that the purpose of the Act was "to regulate, not business activity, but political activity...." *Id.* at 137, 81 S.Ct. at 529. Notwithstanding, the Court cautioned: "There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Id.* at 144, 81 S.Ct. at 533.

In *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court extended *Noerr's* exculpatory principles to attempts to influence the executive branch; the Court held that *Noerr* protected the efforts of large mine owners and union officials to squeeze out smaller coal producers by persuading the Secretary of Labor to raise minimum wage levels. Justice White stated that, "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Id.* at 670, 85 S.Ct. at 1593.

The last of the trilogy, *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), made three important contributions to the development of the doctrine: First, the Court applied *Noerr* to administrative and adjudicative proceedings. Second, it provided the Supreme Court's first application of the "sham" exception foreshadowed in *Noerr:* The Court held that a group of trucking companies' opposition to each and every license application made by their competitors " 'with or without probable cause, and regardless of the merits of the cases,' " did not deserve *Noerr-Pennington* immunity. Finally, in so holding, *California Motor Transport* made clear that the *Noerr-Pennington* doctrine rested squarely upon the first amendment rights of petition and association. *Id.* at 510–12, 92 S.Ct. at 611–12.

Noting that "the decision of the NFPA will be largely determinative of what the legislatures do," the district court concluded that there was "an intent to influence legislative action through the NFPA in this case, which is protected by *Noerr-Pennington.*" Three previous district court decisions have reached similar conclusions. *Sessions Tank Lines, Inc. v. Joor Manufacturing, Inc.*, 1986–1 Trade Case (CCH) ¶ 66,989 (C.D.Cal.1986) (Western Fire Chiefs Association), *appeal docketed*, No. 86–6208 (9th Cir.); *Wheeling-Pittsburgh Steel Corp. v. Allied Tube & Conduit Corp.*, 573 F.Supp. 833 (N.D.Ill.1983) (NFPA); *Rush-Hampton Industries v. Home Ventilating Institute*, 419 F.Supp. 19 (M.D.Fla.1976) (Southern Building Code Congress; International Conference of Building Officials; Building Officials and Code Administration International). These decisions rely upon two intertwined yet separable strands of argument: First, because state and local governments routinely enact the NEC into law, the NFPA takes on a "quasi-legislative" nature. Therefore, the argument goes, under *Noerr-Pennington,* attempts to influence the NFPA may be equated with attempts to influence the government. Second, because the NEC forms the basis for a substantial number of governmental codes, Allied's conduct should be construed as an indirect petition to state and local governments. As we conclude that Allied's "ballot stuffing"—a subversion of the NFPA code-making process—should not be deemed governmental petitioning, we find neither of these arguments persuasive.

### A.

We decline Allied's invitation to extend *Noerr-Pennington* immunity to lobbying activities directed toward a "quasi-legislative" body such as the NFPA.[4] First, the policies which underlie the doctrine do not warrant such an extension. *Noerr's* holding depended upon the unique nature of

petitions directed to the government in our political system: Justice Black focused upon the "right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws...." 365 U.S. at 139, 81 S.Ct. at 530. He explained that, "[i]n a representative democracy such as this, ... government act[s] on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." *Id.* at 137, 81 S.Ct. at 529. The Court feared that applying the Sherman Act to "disqualify people from taking a public position on matters in which they are financially interested" could "deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them." *Id.* at 139, 81 S.Ct. at 531. Moreover, "such a holding would substantially impair the power of government to take actions through its legislature and executive that operate to restrain trade." *Id.* at 137, 81 S.Ct. at 529.

These concerns do not apply with equal force to private organizations. Ideally, a legislature acts in the public interest. If it fails to do so, its members must answer to the constituents they represent. We must therefore allow an unrestricted flow of information to the government to ensure a complete consideration of the issues, secure in the reasonable expectation that our representatives will act in the public interest. No similar safeguards exist to prevent a private organization from adopting policies contrary to the interests of the general public—in the instant case, establishing an anticompetitive restraint of trade. *See American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571, 102 S.Ct. 1935, 1945, 72 L.Ed.2d 330 (1982) (standard-setting organizations may "be rife with opportunities for anti-

---

4. Allied has stipulated that the NFPA is a "private, *non-governmental* organization." (emphasis added). Moreover, Allied has made no claim of any official delegation of governmental power to the NFPA. Thus, the NFPA's alleged "qua-

si-legislative" status results solely from the *de facto* "delegation" of law-making authority evinced by the extent of the reliance of the various governments upon the NEC.

competitive behavior"); *see generally* Hurwitz, *Governmental Process, the First Amendment, and the Boundaries of Noerr,* 74 Geo.L.J. 65, 90–93 (1985).

As the Supreme Court stated in *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 45, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985), "[w]e may presume, absent a showing to the contrary, that [a government] acts in the public interest. A private party, on the other hand, may be presumed to be acting primarily on his or its own behalf." *See also Hydrolevel, supra,* 456 U.S. at 571, 102 S.Ct. at 1945 ("Although, undoubtedly, most serve [private standard-setting organizations] without concern for the interests of their corporate employers, some may well view their position ..., at least in part, as an opportunity to benefit their employers."). A private organization's agenda often will not coincide with, and may be directly contrary to, the interests of the broader public. Neither the organization, its membership, nor its leadership is checked by any accountability to the general public. Moreover, even if the organization attempts to act in accordance with its conception of the public interest, that conception is necessarily colored by the composition of its membership. *See* Hamilton, *The Role of Nongovernmental Standards in the Development of Mandatory Federal Standards Affecting Safety or Health,* 56 Tex.L.Rev. 1329, 1380–86 (1978) (private standard-setting organizations may not provide "sufficient participation by consumers, workers, and small business," and may not give "adequate consideration" to "certain noneconomic interests in developing a consensus when most of the participants are representatives of economic interests").

Our concern that these organizations might operate contrary to the public interest becomes particularly acute in view of their importance within the economy. A private standard-setting organization "wields great power in the Nation's economy." *Hydrolevel, supra,* 456 U.S. at 570, 102 S.Ct. at 1944–45. The standards it develops and their interpretations " 'may result in economic prosperity or economic failure, for a number of businesses of all

sizes throughout the country,' as well as entire segments of an industry." *Id.,* quoting H.R.Rep. No. 1981, 90th Cong., 2d Sess., 75 (1968).

Second, extending *Noerr-Pennington* to such "quasi-legislative" bodies would raise serious practical problems: How many and which governmental bodies must enact a code before the organization takes on a quasi-legislative nature? To what extent does a code have to be enacted? If the governmental bodies decide to amend a code before adopting it, how extensive can the changes be before the members of the organizations lose *Noerr-Pennington* protection? The difficulty of answering such questions underscores the differences between petitioning a governmental body and lobbying a private organization.

For the foregoing reasons, we find Judge Wisdom's opinion in *Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530 (5th Cir.1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979), to be persuasive authority. In *Mohammad,* an abortion clinic claimed that members of a nearby hospital's OB–GYN staff had conspired to restrain trade in the abortion market in the Tallahassee area. The defendant physicians had communicated their concerns about the ethics of some of the clinic's practices to a private organization of area physicians, to the Executive Director of the Florida Board of Medical Examiners (BOME), and to the head of residency at another hospital. At the same time, the physicians discussed their concerns amongst themselves. The district court granted summary judgment to the doctors, holding that the communications and discussions were protected under *Noerr-Pennington.*

The Fifth Circuit disagreed. The court distinguished between the communications addressed to the BOME, "a creature of state law," *id.* at 542, and the other communications. The former were "a form of activity ... protected by the *Noerr-Pennington* doctrine absent proof of sham." *Id.* However, this protection did not extend to the other communications, even though state statutes vested the recipient

organizations "with a kind of quasi-legislative authority." *Id.* at 545. State statutes permitted the BOME to take action against physicians disciplined by private medical groups, but did not require that it do so. Therefore, Judge Wisdom concluded, "[h]ospital medical staffs and medical societies play an important role in Florida's regulatory scheme, but that role is not a governmental one." *Id.* (footnotes omitted).

We believe that *Mohammad* has application here. State and local governments are no more required to enact the NEC into law than the BOME was required to act upon the conclusions of the private disciplinary groups in *Mohammad.* The fact that governments usually do accept the recommendations embodied in the NEC does not transform the NFPA into a governmental organ; consequently, attempts to influence the NFPA, a private organization, cannot claim *Noerr-Pennington* protection. *See also United States v. Johns-Manville Corp.,* 259 F.Supp. 440, 452–54 (E.D.Pa. 1966) (recognizing that activities designed "to influence the decision of public officials" are protected under *Noerr-Pennington,* but refusing to grant summary judgment dismissing claims that defendant conspired to bring about the adoption of anticompetitive pipe specifications by two private organizations).

### B.

We also reject Judge Sprizzo's conclusion that Allied's "intent to influence legislative action through the NFPA" brought its activities within the bounds of *Noerr-Pennington.* Allied's behavior, which itself caused independent antitrust injury to Carlon, should not be excused merely because its actions also indirectly influenced state and local governments. Simply put, Allied's conduct did not constitute petitioning of the government within the meaning of *Noerr-Pennington;* rather, its conduct was a subversion of the legitimate purposes of the NFPA.

First, in deciding whether group action falls within the bounds of *Noerr-Pennington,* several courts of appeals have drawn a distinction between the submission of a group's recommendations to the government and the antecedent conduct which generated those recommendations. In *Mohammad, supra,* the Fifth Circuit distinguished between the actions of medical review committees in "reporting disciplinary findings and suspected violations to the BOME [which] may be petitioning activity within the meaning of the first amendment," and "communications within those groups[, which] are not." 586 F.2d at 545. Similarly, in *Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 700 F.2d 785 (2d Cir.1983), we refused to grant *Noerr-Pennington* protection to a conspiracy to establish an anticompetitive tariff merely because the tariff was eventually filed with the FCC. We noted that "[t]he decision to impose and maintain the interface tariff was made in the AT & T boardroom, not at the FCC." *Id.* at 807. The fact that the FCC "might ultimately set aside" the tariff did "not transform AT & T's independent decision ... into a 'request' for governmental action or an 'expression' of political opinion." *Id.* (footnote omitted). *See also United States v. Southern Motor Carriers Rate Conference, Inc.,* 702 F.2d 532, 542 (5th Cir.1983) (*Noerr* does not protect collective action by common carriers to establish anticompetitive rates which are eventually submitted to the state regulatory commission, but does protect the submission of those rates), *aff'g en banc,* 672 F.2d 469 (5th Cir.1982), *rev'd on other grounds,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). These decisions control the instant case.

Second, the district court's application of the *Noerr-Pennington* doctrine contravenes the maxim that "exemptions from the antitrust laws must be construed narrowly." *Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 126, 102 S.Ct. 3002, 3007, 73 L.Ed.2d 647 (1982). The policies behind the *Noerr-Pennington* doctrine—protecting the right to petition the government and insuring an uninhibited flow of information to governmental representatives—do not require that Allied's anticompetitive behavior be ignored. Allied might have made its views known, and provided

all the information it deemed relevant, by directly petitioning state and local governments at the adoption stage.

Nor are we swayed by Allied's contention that, because of the heavy reliance placed upon the NEC by various governments, the only effective method of influencing these governments is through the NEC amendment process. Allied's own survey shows that over half the states and cities polled either amended the NEC before adopting it or refused to adopt it at all. As the district court acknowledged, "there is obviously an opportunity to change the mind of the legislature and ... there is an opportunity for the defendant and the plaintiff to lobby at that level...."

Allied finally argues that a refusal to accord its behavior *Noerr-Pennington* protection would be inconsistent with the Supreme Court's grant of that protection to the railroad's publicity campaign in *Noerr. See also Federal Prescription Service v. American Pharmaceutical Association,* 471 F.Supp. 126, 130 (D.D.C.1979) (efforts to solicit support in a campaign to induce governmental action "were at least indirect attempts to influence governmental behavior" deserving protection), *aff'd,* 663 F.2d 253, 262 n. 6 (D.C.Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982). That holding, Allied contends, authoritatively abolishes any distinction between "direct" and "indirect" petitioning. However, in *Noerr,* the Court held that the railroad's publicity campaign did not violate the antitrust laws because "a publicity campaign to influence governmental action falls clearly into the category of political activity" to which the Sherman Act does not apply. 365 U.S. at 140–41, 81 S.Ct. at 531. Congress, the Court concluded, had not intended the Sherman Act to have "application in the political arena" as "Congress has traditionally exercised extreme caution in legislating with respect to problems relating to the conduct of political activities...." *Id.* at 141, 81 S.Ct. at 531. Allied cannot similarly claim that its conduct constituted "political activity" conducted within the "political arena."

## III.

On cross-appeal, Allied claims that, as a matter of law, its conduct did not constitute an unreasonable restraint of trade.[5] First, Allied argues that an industry participant in a private standard-setting organization should not be held liable under the antitrust laws where a genuine safety concern at least partially motivates its involvement in the process; the organization's rules prevent domination by commercial interests and accord due process to the participants; and objective scientific evidence supports the resulting standard. *Cf. Hydrolevel, supra,* 456 U.S. at 577, 102 S.Ct. at 1948 ("And in this case, we do not face a challenge to a good-faith interpretation of [a private] code reasonably supported by health or safety considerations."). Allied points out that the fear of treble damages and judicial second-guessing might chill participation by financially interested industry members, who have an incentive to undertake the costly process of generating and gathering costly safety information. *See, e.g.,* M. Olsen, *The Logic of Collective Action: Public Goods and the Theory of Groups* (1971) at 14–16. Moreover, while judges are specialists in procedural fairness, they will often have little expertise in the substantive area to which a standard applies. *Cf., e.g., Kletschka v. Driver,* 411 F.2d 436, 443 (2d Cir.1969) (The infeasibility of reviewing every decision and the lack of technical expertise in the substantive area means that "the courts should seek to discourage arbitrary agency action by enforcing the various procedural rights ... and not by under-

---

5. As part of its cross-appeal, Allied also urges that the district court improperly submitted a separate special jury interrogatory asking whether Allied's opposition to Article 331 constituted the "least restrictive means" of expressing opposition to PVC conduit. Carlon argued to the court that the answer was potentially dispositive. Even though Judge Sprizzo disagreed with Carlon's legal theory, he did not abuse his discretion by submitting the question to the jury in order to avoid the possibility of a retrial, *see Litton Systems, supra,* 700 F.2d at 803 & n. 19, particularly because he made clear to the jury that the existence of less restrictive means "was not dispositive" of and was only "tangentially related" to Carlon's antitrust claim.

taking a full substantive review of the justification for the decision.").

However, in this case, Allied violated the integrity of the NFPA's procedures. The jury found that, although Allied acted within the letter of the NFPA's rules, its conduct "subverted" the code making process which Allied admits contained an inherent "potential for abuse." The record substantiates this conclusion: the steel interest's recruitment of the 230 members for a single vote gave it a disproportionate voice, inconsistent with the concept of "consensus" standard-making; few of Allied's recruits had the knowledge or inclination to make an independent decision on the merits of the issue; the industry reacted negatively to what the trade magazines termed the conversion of NFPA's "code-making process ... into a battleground for establishing commercial preference for competing product types;" on Carlon's appeal, the NFPA Board of Directors found that Allied had "circumvented" NFPA rules; Jack Sanders, chairman of an NFPA committee formed to review its voting procedures after the May, 1980 meeting, testified that Allied's actions were inconsistent with the intent of those procedures; following, and as a direct result of, Allied's conduct, the NFPA amended its rules to prevent a recurrence of the PVC conduit vote; finally, Judge Sprizzo sustained the jury's verdict against Allied's challenges. In short, Allied packed the annual meeting with newly registered members, whom it subsidized, for the sole purpose of achieving an anticompetitive result—the exclusion of PVC conduit from the marketplace. We refuse to permit a defendant to use its literal compliance with a standard-setting organization's rules as a shield to protect such conduct from antitrust liability.

Nor do we find any merit in Allied's claim that it should not be held liable under the antitrust laws because the exclusion of PVC conduit from the 1981 NEC was supported by objective scientific evidence. The "objective validity" of a restraint has never been a defense to an antitrust charge, cf. *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397–98, 47 S.Ct. 377, 379–80, 71 L.Ed. 700 (1927) (reason-

ableness of price is not a defense to a price fixing charge).

## IV.

The judgment of the district court is vacated and remanded with directions to reinstate the jury's award.