SESSIONS TANK LINERS, INC. dba
Southwest Tank Liners, Inc.,
Plaintiff-Appellant,

v.

JOOR MANUFACTURING, INC., et al.,
Defendants-Appellees.

Nos. 86–6208, 86–6470.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 8, 1987.

Decided Sept. 2, 1987.

Maxwell M. Blecher and Christopher Layne, Los Angeles, Cal., Laurie J. Orange, Sternberg, Eggers, Kidder & Fox, San Diego, Cal., for plaintiff-appellant.

David E. Lundin, Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, San Diego, Cal., for defendants-appellees.

William J. Meeske, Los Angeles, Cal., Alexander D. Thomson, Raymond A. Tabar, Whittier, Cal., Catherine G. O'Sullivan and Dean C. Graybill, Washington, D.C., for amici curiae.

Before SNEED, BOOCHEVER and THOMPSON, Circuit Judges.

SNEED, Circuit Judge:

Joor Manufacturing (Joor) successfully sought to have the Western Fire Chiefs Association (WFCA) amend its influential model fire code in a manner disadvantageous to Sessions Tank Liners, Inc. (Sessions), a competitor. Sessions sued Joor for violating the Sherman Act. The district court granted the defendant summary judgment, ruling that the *Noerr-Pennington* doctrine exempted Joor's conduct from antitrust liability. Sessions appeals.

We conclude that legitimate efforts to influence or lobby private, model code associations *are* protected by the *Noerr-Pennington* doctrine. However, we also conclude that "abuses" of the code-promulgating process designed primarily to harm competitors are a "sham" and fall outside *Noerr-Pennington* protection. Because Sessions has stated a very limited "sham" exception claim not considered by the court below, we reverse and remand for further proceedings.

## I.

## FACTS

Joor manufactures metal tanks used for the underground storage of hazardous fluids, principally gasoline. Sessions repairs leaks in these tanks by puncturing them while still underground and coating their inner surface with an epoxy lining. Removing a tank to repair it aboveground is so costly that customers will ordinarily buy new tanks if this underground lining process is not available. Thus appellant's repairs compete directly with Joor's sales.

According to Sessions, tank lining has been in successful use for some thirty years. In 1980, however, demand for appellant's service began to decline, particularly in California. At the same time, fire department officials in various California localities began denying Sessions the permit necessary to perform its work.

The reason, Sessions alleges, has its source in a proposed amendment to the WFCA's Uniform Fire Code (the Code), a model fire safety code highly influential in the western states.[1] The WFCA is a non-

---

1. The record does not make clear exactly which states, counties or municipalities have enacted the Code into law, or to what extent local legislatures have deviated from its terms when adopting it. According to the WFCA, the Code "has been adopted in a majority of the counties,

profit, voluntary membership organization established in 1891. Although it has no official governmental status, the WFCA limits its voting membership exclusively to public officials, most of whom are involved in enforcing fire safety regulations in their respective jurisdictions. The Code has no legal force until local governments choose to adopt or enforce its provisions.

In 1978 the WFCA created a subcommittee to revise Article 79 of the Code, which deals with the use and storage of inflammable fluids.[2] One of the Article 79 subcommittee's tasks was to develop safety standards for the underground repair of storage tanks. The alleged safety problem posed by underground repair lies in the possibility that corrosion—which might have caused the leakage—will go undetected. Sessions' epoxy lining stops leaks but does not strengthen the tank walls. Joor insists that aboveground inspection is necessary to ascertain whether the leaking tank's walls can continue to withstand ground pressure.

Joor's president, Howard Robbins, became a member of the Article 79 subcommittee and there argued strenuously that the underground tank lining process should be completely prohibited. On March 17, 1981, at a subcommittee meeting, Robbins moved to amend the Code to require leaking tanks to be removed from the ground. The proposed amendment was calculated to prevent Sessions and similar companies from repairing tanks. Removing a tank from the ground prior to the tank lining

process would destroy the cost advantage of that process. Robbins's motion carried unanimously.

Neither Sessions nor any other firm in the tank lining field had a voting representative on the Article 79 subcommittee. However, Sessions was not barred entirely from participating in the subcommittee's deliberations. It was permitted to submit materials to the subcommittee and to have a representative offer an oral defense of its process at the March 17 meeting. Subsequently, representatives for Sessions and other tank lining companies presented arguments and evidence at the Code Committee meetings and at the WFCA annual conference. Nonetheless, these two bodies both ratified the subcommittee's amendment, which thereby became part of the Code in 1982.

Sessions brought suit under sections 1 and 2 of the Sherman Act, alleging that Joor combined with other tank manufacturing interests to procure an unreasonable restraint of trade, and that Joor was attempting to monopolize the relevant market. Sessions further accused Robbins of making misrepresentations to fire officials inside and outside the WFCA, of conspiring with the same, and of denying Sessions access to the Article 79 subcommittee.

## II.

## ISSUES

This case requires that we address two issues: (1) Assuming Robbins committed

cities and other political subdivisions in the ten western United States (Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon, Utah and Washington) and is widely adopted in the thirteen southwestern and mid-western states." Brief of the WFCA et al., amici curiae, at 5. In addition, local fire officials may enforce Code provisions or standards even when their respective localities have not enacted these provisions or standards into law.

2. The WFCA revises the Code according to the following procedures. An ad hoc subcommittee is established to consider particular issues. Representatives of private industry are often invited to serve thereon. At the time of the events in question, such private industry members had full voting powers within the subcommittee on which they served. (The WFCA has now changed its rules so that private industry

representatives no longer have voting power even at the subcommittee level.) If a subcommittee votes to propose an amendment to the Code, the proposal is referred to the WFCA's standing Code Committee, which publishes a notice in two national trade journals and then holds meetings on the proposed amendment. Anyone may attend these hearings, speak and present evidence, but only active WFCA members—no private industry representatives—may vote. After the hearings, both the original proposal and the Code Committee recommendation are again published in the trade journals. Finally, at the WFCA annual conference, where once more anyone may participate but only WFCA members may vote, the entire body of the WFCA approves or rejects the proposed amendment.

no improprieties in his lobbying efforts, can his successful persuasion of the WFCA constitute an antitrust violation under the Sherman Act? (2) If not, could the alleged improprieties by Robbins nonetheless state an antitrust claim? The first issue concerns the applicability of the *Noerr-Pennington* doctrine, and we find that *Noerr-Pennington* does apply in this context. The second concerns the applicability of that doctrine's "sham" exception, and we find that it too applies in this case, although only in a limited fashion.

### III.

### ANALYSIS

A. *Applicability of the* Noerr-Pennington *Doctrine*

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), defendants were a consortium of railroad interests that had successfully advocated legislation and executive action harmful to the emerging trucking industry. As here, plaintiff alleged that defendants' campaign had employed misrepresentations and other improper tactics. The first question addressed by the Court, however, was whether the Sherman Act prohibited the railroads' concerted lobbying efforts regardless of any improprieties: whether, that is, the lobbying itself was a "combination ... in restraint of trade." 15 U.S.C. § 1.

The Court answered in the negative. The Sherman Act regulates "business activity," the Court held, not "political activity." 365 U.S. at 137, 81 S.Ct. at 529. The Court supported its conclusion with references to the constitutional right of petition, the value of public input into the political process, and legislative intent. *See id.* at 137–40, 81 S.Ct. at 529–31.

In subsequent cases, the Court has made clear that *Noerr* applied to the petitioning of all governmental bodies. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d

626 (1965). In the case before us, however, the defendant's efforts were directed at a private association serving as a conduit to local legislatures and various governmental agents. If *Noerr-Pennington* does *not* apply here, then Joor could potentially be liable in antitrust simply for bringing to the WFCA's attention true and persuasive information about the safety hazards of a competitor's product—if Joor did so in combination with others or in an attempt to monopolize.

We hold that *Noerr-Pennington* applies. It immunizes proper lobbying—either singly or in combination with others—of a private association engaged in promulgating an important model code to influence legislative and executive decisions.

Our holding rests on the various constitutional, policy and statutory considerations that underlie the *Noerr-Pennington* doctrine. Each of these considerations points clearly to the conclusion that *Noerr-Pennington* applies here.

1. *Constitutional interests.*

*Noerr-Pennington* exists in large part to protect the constitutional right to petition the government. *Noerr,* 365 U.S. at 138, 81 S.Ct. at 530; *see City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 399, 98 S.Ct. 1123, 1129, 55 L.Ed.2d 364 (1978). Joor argues that the WFCA is in effect a "governmental" body exercising legislative or quasi-legislative powers. Sessions emphasizes the WFCA's formally private status. The labels "governmental" and "private" are, however, of limited utility.

■ Petitioning, for constitutional purposes, is not confined to entreating the government directly for relief. *See, e.g., Brotherhood of R.R. Trainmen v. Virginia ex rel. Va. State Bar,* 377 U.S. 1, 7, 84 S.Ct. 1113, 1117, 12 L.Ed.2d 89 (1964) (right to petition courts extended to workers' cooperative plan to advise one another of legal rights). Instead it encompasses appeals to some who are not governmental actors but who are nevertheless involved in the political process. Courts have re-

peatedly construed *Noerr-Pennington* in this manner.

In *Noerr* itself, an important component of the railroads' strategy was to exert pressure on governmental actors through the medium of public opinion. The Court held that the railroads' "publicity campaign to influence governmental action falls clearly into the category of political activity" shielded from antitrust liability. 365 U.S. at 140–41, 81 S.Ct. at 531. We have applied *Noerr-Pennington* to an advertising campaign designed to influence a state's voter initiative process. *See Subscription T.V., Inc. v. Southern Cal. Theatre Owners Ass'n*, 576 F.2d 230, 232 (9th Cir.1978). Finally, attempts to persuade private parties to join in a commercial boycott have also received *Noerr-Pennington* protection where the boycott was part of an effort to procure governmental action. *See, e.g., NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907, 913–15, 102 S.Ct. 3409, 3425–26, 73 L.Ed.2d 1215 (1982); *Missouri v. National Org. for Women, Inc.*, 620 F.2d 1301, 1314 (8th Cir.), *cert. denied*, 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980).

█ So too, Joor's efforts, albeit directed at an ostensibly private body, were without doubt part of a plan ultimately to procure favorable legislation. *See Federal Prescription Serv. Inc. v. American Pharmaceutical Ass'n*, 471 F.Supp. 126, 130 (D.D.C.1979) (Gesell, J.) (efforts to induce private medical associations to adopt favorable position protected under *Noerr* as "indirect attempts to influence governmental behavior"), *aff'd*, 663 F.2d 253, 262 n. 6 (D.C.Cir.1981) (alternative holding), *cert. denied*, 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982). The WFCA, whether designated as "public," "private," or even "quasi-governmental," plays an important and generally accepted role in the legislative process of the western states. The WFCA's substantial power and the Code's

impact on local fire safety laws cannot be denied. For this reason the First Amendment right of petition affords protection to those seeking to influence the WFCA's decisions.

█ Moreover, the right to petition is not the only First Amendment guarantee on which *Noerr-Pennington* rests. Rights of association are also implicated. *See California Motor Transport*, 404 U.S. at 510, 92 S.Ct. at 611; *see also Claiborne*, 458 U.S. at 911, 102 S.Ct. at 3424 (rights of association and petition are inseparable). Joor was undoubtedly exercising its associational rights when it participated in a private organization to advance its legislative causes, whatever they may have been. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958). Thus, First Amendment purposes would be served by extending *Noerr-Pennington* to the circumstances of this case.[3]

### 2. *Political Process Interests.*

*Noerr-Pennington* also promotes the effective operation of our political processes. *See City of Lafayette*, 435 U.S. at 399, 98 S.Ct. at 1129; *In re Airport Car Rental Litigation*, 693 F.2d 84, 86 (9th Cir.1982), *cert. denied*, 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983). As the Court saw it in *Noerr*, "the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." 365 U.S. at 137, 81 S.Ct. at 529. Hence the result in *Noerr* was deemed necessary in order not to "deprive the government of a valuable source of information." *Id.* at 139, 81 S.Ct. at 530. This concern too is applicable here.

Municipal and other local lawmakers rely on the WFCA's investigatory work in approving or disapproving myriad products and safety standards. In many instances it would be either impossible or inefficient for

**3.** By itself, however, this conclusion does not end the inquiry into either *Noerr*'s applicability or Joor's liability. Antitrust law often impinges on First Amendment interests. Boycotts include an associational component, and an agreement to fix prices may of course be speech. Nonetheless, these activities can in certain circumstances be prohibited. The Sherman Act necessarily presupposes that the "right of business entities to 'associate' to suppress competition may be curtailed." *Claiborne*, 458 U.S. at 912, 102 S.Ct. at 3425; *see National Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 697, 98 S.Ct. 1355, 1368, 55 L.Ed.2d 637 (1978).

**464**

each local government to do otherwise. Most localities lack both the required resources and the talent. At the same time, it also would be inefficient if not impossible for particular businesses effectively to lobby every city or county council that adopts a fire code. *See Wheeling-Pittsburg Steel Corp. v. Allied Tube & Conduit Corp.*, 573 F.Supp. 833, 838 (N.D.Ill.1983). It follows that the WFCA renders valuable civic services and that the information it receives is quite important in the legislative process.

Within the WFCA, the various committees and subcommittees depend largely on the input of commercially self-interested parties for the expertise and research necessary to an informed decision. Self-interested information may be biased information, but "it is quite probably people with ... a hope of personal advantage who provide much of the information upon which governments must act." *Noerr*, 365 U.S. at 139, 81 S.Ct. at 530. No one seriously assumes otherwise. The policy interests emphasized in *Noerr-Pennington* require that "free-flowing communication" be encouraged at all levels of governmental decisionmaking. *See Airport Car Rental Litigation*, 693 F.2d at 86. This policy also points in favor of *Noerr-Pennington*'s applicability here.

### 3. *Statutory considerations.*

■ Finally, *Noerr-Pennington* rests on sound statutory grounds. To prevail under the Sherman Act, a plaintiff must not only show an unlawful restraint of trade, but also prove that the defendant is legally responsible for this restraint. The Sherman Act was not intended to make private parties liable, in the ordinary case, for governmental acts. Thus where the alleged restraint of trade "was the act of a public official who is not claimed to be a co-conspirator," a private defendant is not ordinarily liable for any damages caused thereby. *Pennington*, 381 U.S. at 671, 85 S.Ct. at 1594. A leading antitrust treatise has

expressed this aspect of *Noerr-Pennington* in terms of "proximate cause":

> private parties may have influenced or persuaded the government to act, but the government's decision to act reflects an independent governmental choice, constituting a supervening "cause" that breaks the link between a private party's request and the plaintiff's injury.

P. Areeda & H. Hovenkamp, *Antitrust Law* 4 (Supp.1986).[4] Within our own circuit, Judge Schwarzer has also emphasized this point. *See In re Airport Car Rental Antitrust Litigation*, 521 F.Supp. 568, 574 (N.D.Cal.1981) ("if plaintiff suffered injury, it resulted from the acts of public officials ... not the joint action of defendants"), *aff'd*, 693 F.2d 84 (9th Cir.1982), *cert. denied*, 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983).

■ These considerations apply here. The Article 79 amendment as initially proposed by Joor's president and later accepted by the entire WFCA had no legal force and little injurious effect until it was adopted by local legislatures or enforced by local fire officials. Absent improprieties in the lobbying process, the acts of these governmental officials should not make Joor liable to Sessions under the Sherman Act. *See Noerr*, 365 U.S. at 135–36, 81 S.Ct. at 528 (lobbying not actionable under Sherman Act because private parties not responsible for governmental restraints of trade).

For all the foregoing reasons, we conclude that *Noerr-Pennington* applies to Joor's lobbying efforts within the WFCA.

### B. *Applicability of* Noerr-Pennington'*s "Sham" Exceptions*

■ Sessions alternatively contends that Joor's conduct fell within the "sham" exception to the *Noerr-Pennington* doctrine. Robbins, Sessions alleges, deprived Sessions of meaningful access to the Article 79 subcommittee, conspired with various public fire officials, and misrepresented facts

---

**4.** *See also* Hurwitz, *Abuse of Governmental Processes, the First Amendment, and the Boundaries of Noerr*, 74 Geo.L.J. 65, 123 (1985) ("In the absence of egregious conduct, a governmental decision favorable to the petitioner will negate the proximate causation of any competitive injury.").

both inside and outside the WFCA. The crucial question, as we see it, is whether these asserted improprieties amounted to an "abuse of process," *Clipper Exxpress v. Rocky Mtn. Mot. Tariff Bur., Inc.*, 690 F.2d 1240, 1259 (9th Cir.1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983); *Rodgers v. FTC*, 492 F.2d 228, 232 n. 6 (9th Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974), corrupting the WFCA's decision. Before turning to each of appellant's allegations concerning Joor's abuse of the WFCA's process, a recent decision of the Second Circuit must be considered.[5]

### 1. *The Second Circuit case.*

The Second Circuit recently held *Noerr-Pennington* inapplicable in a case involving a model code association much like the WFCA. *See Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 943 (2d Cir.1987). Superficially, *Indian Head* is contrary to our resolution of the first issue. In fact, however, our difference with the Second Circuit is not so deep as it might appear.

In *Indian Head*, defendant enrolled over 150 new members—most of whom were defendant's employees or agents—into the association and thereby won a pivotal vote by a slim majority. *Id.* at 940–41. The court found that *Noerr-Pennington* did not protect such conduct. We agree with this result; we do not agree, however, that the *Noerr-Pennington* doctrine is generally inapplicable to "model code association" cases.

The essential flaw in the Second Circuit's analysis, as we see it, is that the court conflated the question of whether *Noerr-Pennington* applied with the distinct question of whether its "sham" exception was also applicable:

> Simply put, [defendant's] conduct did not constitute petitioning of the government within the meaning of *Noerr-Pennington:* rather, its conduct was a subversion of the legitimate purposes of the [model code association].

*Indian Head*, 817 F.2d at 945. Although we think the Second Circuit correctly denied immunity in *Indian Head*, the proper analysis of such "subversion" should focus on the applicability of *Noerr-Pennington's* exceptions.

In saying this we recognize that the court in *Indian Head*, by restricting *Noerr-Pennington* to direct petitioning of the government, simplified the law by reducing drastically the scope of the "sham" exception. On the other hand, it complicated the law by requiring that the antitrust law develop the permissible practices of model code associations, their members,

---

5. We must also dispose of a preliminary objection. Joor succeeded in its efforts to amend the Code and thus local fire safety laws. It claims, therefore, that its petitioning was "genuine" and cannot be called a "sham." Not so.

To be sure, the clearest examples of sham petitioning are those in which the defendant's aim was to harm a competitor directly, not through the governmental process that he purported to invoke. *See, e.g., Energy Conservation, Inc. v. Heliodyne*, 698 F.2d 386, 389 (9th Cir.1983) (baseless lawsuit allegedly designed to cause competitor expense and to generate adverse publicity). Perhaps because the term "sham" suggests this sort of situation, courts have sometimes asserted the mistaken proposition for which Joor contends. *See, e.g., WIXT Television, Inc. v. Meredith Corp.*, 506 F.Supp. 1003, 1032 (N.D.N.Y.1980) ("by definition a successful claim cannot be 'sham'").

But there are other instances of sham petitioning in which the defendant genuinely seeks to achieve his governmental result, but does so *through improper means. See, e.g., Handgards,*

*Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993–94 (9th Cir.1979) (infringement suit based on fraudulently obtained patent is in "bad faith" and thus actionable in antitrust despite *Noerr*), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); *Israel v. Baxter Labs., Inc.*, 466 F.2d 272, 278–79 (D.C.Cir.1972) (misrepresentations inducing decision by administrative tribunal are actionable); *Outboard Marine Corp. v. Pezetel*, 474 F.Supp. 168, 179 & n. 19 (D.Del.1979). In such cases, the defendant may well succeed in procuring the desired governmental action, but has nonetheless misused his petitioning privilege. Thus defendant's "success or failure" is "one indicator" of whether his petitioning was a sham, *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 903 (9th Cir.1983), but it is not dispositive.

Commentators occasionally urge courts to use the word "sham" only when referring to disingenuous—rather than unethical—petitioning. But in both cases there is a pretense of seeking an independent, impartial decision. Thus both may fairly be called shams. *See* Hurwitz, *supra* note 4, at 109.

and participating non-members. It is unlikely that this exchange will result in a net simplification.[6]

### 2. *Exclusion from the Article 79 Subcommittee.*

■ Sessions argues that it was denied meaningful access to the WFCA because it had no voting representative on the Article 79 subcommittee. Although denial of access to a decisionmaking tribunal can provide grounds for a "sham" exception claim, *see California Motor Transport*, 404 U.S. at 511–12, 92 S.Ct. at 612, there can be no such claim here. Even if Sessions had a valid claim based on exclusion from the subcommittee, it has offered no evidence that Joor, rather than the WFCA, was responsible for this exclusion.

### 3. *Conspiracy.*

■ Antitrust immunity under *Noerr-Pennington* does not extend to private parties who have entered into a "conspiracy" with governmental actors. *See Clipper Exxpress*, 690 F.2d at 1252 n. 17; *Harman v. Valley Nat'l Bank*, 339 F.2d 564, 566 (9th Cir.1964); P. Areeda & H. Hovenkamp, *Antitrust Law* 20–25 (Supp.1986). Sessions introduced evidence below showing that Joor routinely entertained WFCA members and other local fire officials and provided them with certain "promotional gifts" such as coffee mugs and tape measures. The district court concluded, however, that this evidence failed to raise a triable issue of conspiracy. We agree.

Joor's efforts to curry favor with WFCA members may have been somewhat indelicate, but they provide no evidence of any unlawful agreement. *See Metro Cable Co.*

*v. CATV, Inc.*, 516 F.2d 220, 230–31 (7th Cir.1975) (on motion to dismiss) (allegations of campaign contributions, even if true, do not provide basis to withhold *Noerr-Pennington* immunity). Sessions, it develops, has offered no "specific factual support of the allegations of conspiracy," which this court requires for summary judgment purposes. *See Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 672 (9th Cir. 1980).

We must acknowledge, however, that the fact that Robbins sat on the very subcommittee that launched the amendment so favorable to Joor is unsettling. The spectre raised by this circumstance is that a body ostensibly devoted to the public good—and possessed of considerable power because of this reputation—may have been "captured" by particular private interests. *See generally* Wiley, *A Capture Theory of Antitrust Federalism*, 99 Harv.L.Rev. 713 (1986). Private standards-setting associations are particularly vulnerable to this sort of abuse. *See American Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 571, 102 S.Ct. 1935, 1945, 72 L.Ed.2d 330 (1982). In essence this was the situation in *Indian Head*, where certain steel interests "took over" the model code association on the eve of a critical vote by enrolling hundreds of new members drawn from their own ranks. Such conduct constitutes exactly the kind of abuse of process that the "sham" exception to *Noerr-Pennington* serves to weed out.

■ Despite the fact that Robbins' position on the Article 79 subcommittee creates an appearance of impropriety, Sessions has not made a sufficient showing that Joor or other tank manufacturing interests com-

---

**6.** A few other observations with respect to the *Indian Head* case may be helpful. The Second Circuit stressed that private bodies, unlike governmental actors, cannot be assumed to be acting in the public interest. *See* 817 F.2d at 943–44. True or not, this point overemphasizes the policy aspect of the *Noerr* doctrine at the expense of its other components. The court gave short shrift to antitrust defendants' petitioning rights in situations where they had not "subverted" the organization's code-promulgating process, and it made no mention at all of their associational rights, which are plainly implicat-

ed. More troubling still, the court held that defendant could not try to justify the organization's failure to approve plaintiff's product (which formed the basis of the lawsuit) by showing that plaintiff's product was in fact unsafe: "The 'objective validity' of a restraint of trade has never been a defense to an antitrust charge...." *Id.* at 947. Thus *Indian Head* in effect suggests that defendants may owe treble damages simply for bringing forward undisputed evidence that a rival's product is actually hazardous. The *Noerr* doctrine exists precisely to prohibit such a result.

bined to capture the WFCA. Sessions has not alleged that anyone on the subcommittee other than Robbins had a financial interest in the proposed amendment. Nor has Sessions offered evidence that Robbins in fact exerted an improper influence over any WFCA members or exercised improper control over WFCA procedures or voting. The entire WFCA membership, consisting exclusively of public officials, had final authority to accept or reject the proposed amendment, and Sessions has provided us with no reason to doubt their integrity.[7]

### 4. Misrepresentation.

The gravamen of Sessions' accusations of impropriety is that Joor persuaded the WFCA by the use of deceptive material. In particular, Sessions challenges a letter that Robbins submitted to the Article 79 subcommittee in which he summarized his objections to the underground tank lining process. Robbins wrote that:

[T]wo certainties exist:

1. When leakage is encountered, weakened metal exists, and,

2. It is difficult to ascertain remaining metal thickness from an observation point inside the tank.

Acceptance of tank lining, as is being proposed, implies the discarding of UL 58 or equivalent strength requirements.

Excerpt of Record (E.R.) at 702–03.

According to Sessions, all three of these representations were false. First, there may be no weakness in the metal of a leaking tank. Second, ultrasonic testing can accurately measure the thickness of the tank walls while the tank is still underground. Finally (still according to Ses-

sions), Robbins' conclusion falsely suggests that tank lining somehow repudiates or voids the tank's UL label of approval.[8] The UL label indicates only that the tank in its original condition satisfied certain wall thickness specifications, and lining a used tank has no effect on its continuing ability to satisfy those requirements. Sessions later procured a letter from UL confirming this position. See E.R. at 309.

The district court concluded, however, that Robbins' statements were not deceptive, but "simply part of a reasoned argument." E.R. at 703. The district court said that "Joor may have been wrong, [but] it is clear that the WFCA could not have been misled by what Joor said." Id.

It is possible that the district court's conclusion was, for summary judgment purposes, erroneous. If Robbins was "wrong" in his letter, the Article 79 subcommittee may well have been misled. And there is evidence that it was. The minutes from the meeting at which the subcommittee voted to accept Joor's amendment reflect an acceptance of the erroneous idea described above: "The committee was unanimous in their disapproval of cutting an opening in a tank *and thus destroying the integrity of the UL approval* to proceed with the lining process." E.R. at 580 (emphasis added).

■ Misrepresentations, however, do not necessarily destroy *Noerr-Pennington* immunity. An antitrust plaintiff cannot summon the "sham" exception by alleging that defendant made misrepresentations when pursuing legislative—as opposed to adjudicative—action. *Clipper Exxpress*, 690 F.2d at 1261; *see California Motor*

---

7. If the WFCA were an association of private interests putatively engaged in self-regulation, Sessions would have a very different antitrust claim. Joor's liability would probably not be altered, but the WFCA as a whole might then be subject to suit. Cf. *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (engineers' association was liable in antitrust for taking position that competitive bidding was unethical); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (allegations that gas producers' and sellers' association had with anticompetitive intent refused to approve and to service plaintiff's

product stated antitrust claim). But Sessions has not sued the WFCA as a whole, nor impugned the integrity of its ultimate decision-making process.

8. UL—short for Underwriters Laboratories—is a private, nonprofit corporation that establishes standards and specifications for products in a wide variety of industries. The UL label on a product indicates that it meets the relevant standards. The parties agree, and the district court found, that UL approval "is essential to the successful marketing of a product." E.R. at 695.

*Transport,* 404 U.S. at 513, 92 S.Ct. at 613; *First Am. Title Co. v. South Dakota Land Title Ass'n,* 714 F.2d 1439, 1447 (8th Cir. 1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *Metro Cable,* 516 F.2d at 228 (7th Cir.1975).

Sessions, however, argues that the WFCA is not a legislative body. Perhaps so, but it was legislative action that both Sessions and Joor sought. Moreover, the WFCA was an indispensable part of the "political arena." *California Motor Transport,* 404 U.S. at 513, 92 S.Ct. at 613. In *Noerr* the Court refused to hold that alleged misrepresentations in a publicity campaign designed to influence legislation were actionable under the Sherman Act. Such conduct fell "clearly into the category of political activity." 365 U.S. at 140–41, 81 S.Ct. at 531. That principle controls this case.

Although the issue is a close one, we hold that that principle does not extend to Joor's alleged misrepresentations made *outside* the WFCA lobbying process, *before* the Code was amended, to local fire officials who thereafter denied Sessions the requisite permits for carrying on its work. The record suggests that these officials were induced to believe that tank lining would "void" the UL label or that tank lining was already prohibited by the Code. *See* E.R. at 232–33. In one case at least, Sessions claims to have evidence that it was Robbins himself who persuaded officials to deny Sessions a permit. *See* E.R. at 660.

■■■ Misrepresentations made to an executive official fall between the clear rules established in the legislative context (where misrepresentations are *not* actionable) and the adjudicative context (where they *are* actionable). *See* P. Areeda & H. Hovenkamp, *Antitrust Law* 44 (Supp.1986). Application of these distinctions is not easy. Executive officials may administer the law, adjudicate claims under the law, or, by framing policy, make law. The lines between the executive, legislative, and judicial function are often quite indistinct. Careful case-by-case analysis is necessary. Where the executive action sought was more a matter of *administering* than of *making* law, misrepresentations inducing the governmental decision will be actionable in antitrust despite the *Noerr-Pennington* doctrine. *Cf., e.g., Woods Exploration & Producing Co. v. Aluminum Co.,* 438 F.2d 1286, 1296–98 (5th Cir.1971) (misrepresentations before state natural gas commission inducing decision under set allocation formulae held unprotected by *Noerr*), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); *Outboard Marine Corp. v. Pezetel,* 474 F.Supp. 168, 178 (D.Del.1979).[9]

Here, if Sessions' allegations are true, the fire officials were asked to respond in an administrative capacity. These officials were asked to deny Sessions its permit either because tank lining violated UL standards or because it violated the Code. This would be a clear instance of administering extant, established standards. We hold that these allegations state a limited "sham" exception claim. To succeed, Sessions must show that Joor's misrepresentations—and not any independent factors—caused the fire officials to act. In addition, it must prove all the other elements of a Sherman Act violation before it is entitled to antitrust damages.

---

9. In *Noerr* itself, defendants had allegedly made misrepresentations to induce executive action. *See* 365 U.S. at 129–30, 81 S.Ct. at 525. Defendants apparently sought an executive decision to enforce existing law *more strictly. See id.* at 131, 81 S.Ct. at 526. That is the kind of policy decision our analysis would probably exclude from the reach of the "sham" exception. In any event, a more recent Supreme Court opinion has clearly established that a person's petitioning immunity does not protect him from at least some deliberate misrepresentations made in pursuit of executive action. *See McDonald v.*

*Smith,* 472 U.S. 479, 484, 105 S.Ct. 2787, 2790, 86 L.Ed.2d 384 (1985) (letter sent to president defaming plaintiff, a nominee for United States attorney, was not immunized by defendant's right of petition and was actionable in libel). Because such misrepresentations also fail to serve *Noerr*'s policy or statutory interests, we see no reason to immunize them in antitrust if they are not to be immune in libel. *See* Hurwitz, *supra* note 4 at 83–84; *see also McDonald,* 472 U.S. at 484, 105 S.Ct. at 2791 (citing antitrust precedent in support of its holding).

The cause of action left to Sessions is a narrow one. Any misrepresentations made by Joor in pursuit of its legislative goals are fully protected under *Noerr-Pennington*. In addition, any injury to Sessions caused by the actual amendment to the Code—whether through governmental or private action in reliance thereon—provides no basis for an antitrust action against Joor. To this extent we fully affirm the summary judgment granted below. We reverse and remand only in order that Sessions be allowed to prove, if it can, injury caused by Joor's misrepresentations to fire officials in their administrative capacity.[10]

AFFIRMED in part; REVERSED and REMANDED in part.

---

**10.** Sessions may of course also attempt to prove that Robbins made misrepresentations to *private* parties not in pursuit of its governmental aims, but rather to harm the tank lining industry directly. The antitrust actionability of such conduct—regardless of Robbins' position on the Article 79 subcommittee—was established in *American Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). Sessions may also proceed with its state law claims, which were not involved in this appeal.