OMEGA HOMES, INC., Plaintiff,

v.

CITY OF BUFFALO, NEW YORK; Anthony M. Masiello, individually and as Mayor of Defendant City of Buffalo; and Alan DeLisle, individually and as Commissioner, Department of Community Redevelopment of Defendant City of Buffalo; MJ Peterson/Forbes Housing Co., Dennis J. Penman, President of Defendant MJ Peterson/Forbes Housing Co.; James Management Corp. and James Anderson, President of Defendant James Management Corp., Defendants.

No. 97–CV–0680C(M).

United States District Court,
W.D. New York.

April 30, 1998.

Gradl Polowitz & Schwach (Wayne R. Gradl, of counsel), Buffalo, NY, for Plaintiff.

Michael B. Risman, Corporation Counsel of the City of Buffalo (Michael B. Risman, and David R. Hayes, of counsel), Buffalo, NY, for Defendants City of Buffalo, Anthony M. Masiello, and Alan DeLisle.

Saperston & Day, P.C. (Bruce S. Zeftel, and Gary L. Mucci, of counsel), Buffalo, NY, for Defendants M.J. Peterson/Forbes Housing Co. and Dennis J. Penman.

Kavinoky & Cook, LLP (Laurence K. Rubin, and Jonathan H. Gardner, of counsel), Buffalo, NY, for Defendants James Management Corp. and James Anderson.

## DECISION and ORDER

CURTIN, District Judge.

### INTRODUCTION

Before the court are defendants' motions to dismiss plaintiff's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1367 (Items 11, 14, 16). Plaintiff responded with an affidavit and a memorandum of law (items 25 and 26), and defendants filed reply briefs (Items 27, 28, 29). The parties appeared before the court on December 22, 1997, for oral argument.

### PROCEDURAL HISTORY

Plaintiff Omega Homes, Inc. ("Omega"), commenced this action on September 2, 1997, with the filing of a summons and complaint (Item 1). Plaintiff alleges that defendants City of Buffalo ("City"), Mayor Anthony Masiello, and Commissioner of Community De-

velopment Alan DeLisle (the "City defendants") violated the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2 *et seq.*, the Donnelly Act, New York General Business Law § 340, and the New York State Constitution, Articles 1 and 3, when they granted exclusive development rights for the Willert Park neighborhood in the City of Buffalo to defendants M.J. Peterson/Forbes Housing Co. ("Peterson"), Dennis J. Penman (President of Peterson), James Management Corp. ("James"), and James Anderson (President of James) (the "private sector defendants") (*Id.*).

On October 17, 1997, plaintiff filed a motion for an Order granting a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure because plaintiff claims it is threatened with irreparable injury (Item 3). In response, defendants filed motions to disqualify plaintiff's attorney (Items 7, 8, 10). After the court denied defendants' motions to disqualify (Item 24), defendants filed motions to dismiss (Items 11, 14, 16). The parties agreed that the court should address defendants' motions to dismiss (Items 11, 14, 16) before addressing plaintiff's motion for a preliminary injunction (Item 3).

### BACKGROUND

Plaintiff is in the business of developing and constructing affordable and subsidized residential housing. Since its formation in 1980, plaintiff has been involved in the development and building of approximately 1,000 residential units in Buffalo and Albany, New York. A number of these projects have been funded by the United States Department of Housing and Urban Development ("HUD") and plaintiff has been selected as a "HUD Demonstration Developer" (Item 1, ¶ 2).

Plaintiff claims that the City defendants created an exclusive development arrangement when they gave the private sector defendants the exclusive right to develop, build, and sell all of the 344 new residential housing units in the Willert Park Neighborhood redevelopment project. Plaintiff asserts that these acts are per se unlawful and constitute a restraint of trade, commerce, and competition (Item 1, ¶ 41).

Defendants explain that this project began after HUD issued a "Notice of Funding Availability" ("NOFA") for grants under section 108(q) of the Housing and Community Development Act of 1974 on July 16, 1996, in the Federal Register. 61 Fed.Reg. 37, 132–41. HUD solicited proposals "to undertake large-scale projects that would create Homeownership Zones—proposals designed to reclaim hard-pressed neighborhoods by creating homeownership opportunities for hardworking low- and moderate-income families and serving as a catalyst for private investment, business creation and neighborhood revitalization." *Id.* at 37,132. "Homeownership Zones are intended to make a major impact in distressed neighborhoods by converting vacant, abandoned land and buildings into thriving, vibrant neighborhoods by using single-family homeownership as a catalyst for revitalization." *Id.* at 37,134. The NOFA further stated that "[o]ffering these home ownership opportunities to low- and moderate-income residents in designated neighborhoods will provide the foundation for needed commercial and economic development." *Id.*

HUD's NOFA stated that "[c]onstruction should be ready to proceed promptly" and "[p]articular attention will be paid to applications that can begin significant construction activities within 60 days of the award of the EDI grant." *Id.* The NOFA explained that "it is expected that applicants will donate land, commit to construct site improvements and public facilities, waive fees, expedite approvals of permits and plans, and otherwise act to remove impediments to the development of affordable housing." *Id.* The NOFA further stated that "it is further expected that the applicant will establish extensive partnerships with the private and non-profit sectors, such as businesses, lending institutions, real estate professionals, builders, educational institutions, nonprofit organizations, religious entities, and other citywide and community-based organizations." *Id.* Applicants initially were required to postmark their applications by September 16, 1996, *id.* at 37,132, but on September 9, 1996, this date was extended until October 8, 1996, in the Federal Register. *Id.* at 47,523–24.

The City of Buffalo applied to establish a Homeownership Zone ("HOZO") in the Willert Park neighborhood. Willert Park is within a New York State Economic Development Zone, pursuant to New York General Municipal Law Article 18–B and City Charter § 281 (subzone 1), and is within the City's Federal Enterprise Community ("FEC"). Willert Park qualified as an Economic Development Zone under New York General Municipal Law § 958 because it is an area of pervasive poverty, high unemployment, and economic distress. Forty-seven percent of the population in this area lives below the poverty level, the unemployment rate is twenty-seven percent, and the owner-occupancy rate is five percent, as compared to fifty-eight percent nationwide (Item 11, Exh. A (HOZO Application)).

On September 11, 1996, there was a public hearing on the proposal before the Economic Development Committee of the Common Council of the City of Buffalo. At this meeting, Council Member at Large Beverly Gray questioned why there were only two developers, Peterson and James, to work on the project. *The Buffalo News,* 9/29/96. After debate, a compromise by Council President James Pitts was approved that requires community development officials to devise a plan to include other qualified developers if the city is awarded the federal grant. *Id.*

The City of Buffalo submitted its application on October 7, 1996, and proposed that a HUD Economic Development Initiative ("EDI") grant and Section 108 loan funds would be used to redevelop the Willert Park neighborhood by subsidizing low- and moderate-income housing. The City's HOZO application indicated that the redevelopment of the Willert Park neighborhood is a continuation of the City's Ellicott Urban Renewal Plan, adopted pursuant to Article 15 of the General Municipal Law. The City also noted that previous development by Peterson and James in the Pratt–Willert project was nationally recognized, and extolled by HUD as an example for HOZO development in HUD's publication "New American Neighborhoods" (Item 19, pgs. 18–19).

In formulating its HOZO application, the City put together a private/public partnership including the City, the New York State Affordable Housing Corporation, M & T Bank, the Ellicott District Community Development Corporation, the Buffalo Urban Renewal Agency, and the Buffalo Neighborhood Revitalization Corporation. The City planned to utilize $7,675,000 in Section 108 loan funds, $5,000,000 in EDI funds, $1,000,-000 in New York State Affordable Housing Corporation funds, $400,000 in FEC funds, $1,200,000 from a Community Development Block Grant ("CDBG"), $1,000,000 in City Funds, $540,000 in Buffalo Enterprise Development Corporation ("BEDC") funds, $1,461,600 in home buyer down payment, and approximately $27,770,000 in permanent mortgage financing to provide for funding of land assembly, demolition, site preparation, public improvements, park improvements, and homeownership assistance (*Id.*).

On April 8, 1997, a press release issued by HUD announced that Buffalo was one of six cities nationwide chosen to receive HOZO EDI grants and Section 108 loan funds. On or about July 22, 1997, HUD formally approved the City's application. According to defendant DeLisle, "the City's application was the highest scoring application among the 97 reviewed by HUD and the City's application was the only one granted in full." (Item 11, ¶ 31).

Based on the foregoing facts, the City defendants and the private sector defendants filed motions to dismiss (Items 11, 14, 16).

### DISCUSSION

In a motion to dismiss, all facts and allegations in the complaint must be viewed in a light most favorable to the plaintiff. *Hamilton Chapter of Alpha Delta Phi. Inc. v. Hamilton College,* 128 F.3d 59, 63 (2d Cir. 1997). "A dismissal is warranted under Rule 12(b)(6) only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* at 62–63 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Notably, "[t]his generous approach to pleading applies in the antitrust context." *Id.* at 63 (citing *Furlong v. Long Island College Hosp.,* 710 F.2d 922, 927 (2d Cir.1983)).

## I. Plaintiff's Federal Antitrust Claims

Plaintiff's first four claims against defendants arise under the Sherman Antitrust Act ("Sherman"), 15 U.S.C. §§ 1 and 2 et seq. Section 1 of Sherman forbids "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1 (1994). Plaintiff alleges that defendants violated Section 1 of Sherman when the City defendants granted the private sector defendants an exclusive right to develop, build, and sell all 344 homes in the Willert Park Neighborhood. Plaintiff argues that this constitutes an unlawful restraint of trade, commerce, and competition, and that defendants conspired to unlawfully restrain competition in violation of Section 1 of Sherman.

Plaintiff also alleges that defendants violated Section 2 of Sherman because they attempted to monopolize and destroy competition. Section 2 of Sherman makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states." 15 U.S.C. § 2 (1994). Plaintiff argues that Willert Park constitutes an "essential facility" and/or "relevant market" and that maintenance of this "monopoly" will cause plaintiff to suffer irreparable injury and thus defendants should be enjoined from maintaining a monopoly pursuant to Section 2 of Sherman.

### A. Defendants City, Masiello and DeLisle (in their official capacities)

■ The City defendants argue that their actions are protected from federal antitrust law under the state action immunity doctrine articulated by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and its progeny. In *Cine 42nd Street Theater Corp. v. Nederlander Org., Inc.*, 790 F.2d 1032, 1039 (2d Cir. 1986), the Second Circuit explained that *Parker*'s "primary teaching is that state economic regulation should not be preempted by

federal antitrust laws without explicit evidence that such is Congress' will." The Second Circuit summarized the *Parker* doctrine in *Cine 42nd Street* as:

(1) When a state acts in its sovereign capacity, its actions are immune from federal antitrust scrutiny. *Parker*, 317 U.S. at 351–52, 63 S.Ct. 307. . . .

(2) . . . A municipality will be immune from antitrust liability only if it acts as an instrumentality of the state, through which the state has clearly and affirmatively chosen to implement its policies. *Community Communications Co. v. City of Boulder*, [455 U.S. 40, 52–54, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) ]; [*Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 411–13, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) ].(3) When a state agency, municipality, or other state subdivision claims a state immunity from federal law, it must first identify a "clearly expressed state policy" that authorizes its actions. [*Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 40, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) ].

(4) So long as the resulting anticompetitive activities are a foreseeable consequence of the state delegation, the "clear articulation" standard has been met. *Hallie*, [471 U.S. at 42–44, 105 S.Ct. 1713.] (5) The second requirement—"active state supervision"—is no longer required in the case of a municipality, because a municipality, unlike a private party, has no incentive to act other than in the public interest. *Hallie*, [471 U.S. at 47, 105 S.Ct. 1713].

*Cine 42nd Street*, 790 F.2d at 1042–43.

■ Based on the foregoing, defendant City argues that it is a municipality which is immune from antitrust liability because it acted pursuant to a clearly articulated state policy to combat urban blight. The City further argues that anticompetitive activities are a foreseeable consequence of this policy. In contrast, plaintiff argues that the state action immunity doctrine does not apply because no state legislation contemplates the monopoly and/or restraint of trade under attack. Plaintiff argues that none of the New York State Urban Renewal Statutes cited by defendants evince a clearly articulat-

ed state policy to replace competition in the residential and/or affordable housing markets.

Under *Parker* and its progeny, the City defendants do not enjoy immunity per se, because the City is a municipality and not a state. *See Cine 42nd Street,* 790 F.2d at 1042. However, the City defendants are immune since they acted as an instrumentality of the state pursuant to a clearly expressed state policy and the anticompetitive effects of their actions were forseeable. *See Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 370–73, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). New York state law authorizes the City defendants' actions because the City acted pursuant to Article 15 of the New York General Municipal Law entitled "Urban Renewal Law" in applying for the EDI grant from HUD. Specifically, the City defendants acted pursuant to § 503, "Powers of Municipalities," that states in pertinent part:

Every municipality is hereby authorized to plan and undertake one or more urban renewal projects and shall have the powers necessary or convenient to carry out and effectuate such project or projects and the purposes and provisions of this article, including but not limited to the following powers:

(a) Cooperate with the federal government and apply for and accept advances, loans, grants, subsidies, contributions and any other form of financial assistance from the federal government, or from the state, county or other public body, or from any sources public or private, for the purposes of this article; . . . .

The City defendants also acted pursuant to § 507, "Disposition of Property," of Article 15 of the New York General Municipal Law and § 968, "Disposition of Property," of Article 18–B of the New York General Municipal Law, when they disposed the real property in Willert Park to the private sector defendants. Section 507 states in pertinent part:

2. Notwithstanding anything to the contrary contained in this article and notwithstanding the provisions of any general, special or local law applicable to the sale of real property by a municipality, such real property and appurtenances thereto may be sold, leased for a term not exceeding ninety-nine years or otherwise disposed of for the effectuation of any of the purposes of the urban renewal plan in accordance with the urban renewal plan: . . . .

Section 968(b) under Article 18–B, "New York State Economic Development Zones," also supports the actions taken by the City defendants and states:

(b) Any real or personal property owned by any local governmental entity or the state and located within an economic development zone may be sold or leased to any person pursuant to this section *without public bidding or public sale . . . .*

(Emphasis added.)

A plain reading of the New York State statutes demonstrates a "clearly articulated" policy under *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 40, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), to combat urban blight. One of the purposes of the Urban Renewal Statute was to combat urban decay in "slum or blighted areas." N.Y.Gen.Mun.Law § 501. Arguably, without this statute, private enterprise would not enter areas of urban decay and blight. *See Cine 42nd Street,* 790 F.2d at 1035.

Contrary to plaintiff's arguments, it is evident that the New York State Legislature contemplated anticompetitive effects when it passed the Urban Renewal Statutes and the laws establishing Economic Development Zones. In attempting to defeat urban blight, the Urban Renewal Statutes removed obstacles and barriers normally faced in a truly competitive market. Many sections of the General Municipal Law state that a public auction or public bidding is not required. *See, e.g.,* N.Y.Gen.Mun.Law §§ 507, 968. As the Second Circuit stated in *Cine 42nd Street,* "[w]hen the state allows for the creation of model cities and urban redevelopment zones, a reasonable consequence of such redevelopment is that decisions internal to the zones will have effects outside them." *Cine 42nd Street,* 790 F.2d at 1047.

Furthermore, contrary to plaintiff's contentions, *Oberndorf v. City and County of Denver,* 653 F.Supp. 304 (D.Colo.1986) (*Oberndorf I* ) supports this court's findings

in the case at bar. In *Oberndorf I*, the city of Denver acted under the state urban renewal statutes and formed a redevelopment plan and condemnation scheme. In ruling, the district court did not grant defendants' motion to dismiss because plaintiffs' allegations of a "sham" created an issue of fact as to whether the officials personally gained from the activity. However, the case at bar is distinguishable from *Oberndorf I* because plaintiff does not allege a "sham" here.

As such, the case at bar is similar to *Oberndorf II, Oberndorf v. City and County of Denver*, 696 F.Supp. 552 (D.Colo.1988), aff'd, 900 F.2d 1434 (10th Cir.), *cert. denied*, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). Following discovery after the ruling in *Oberndorf I*, the District Court granted the defendants' motion for summary judgment and dismissed the complaint because the defendants' actions were consistent with Colorado state law regarding urban renewal, and discovery revealed that the evidence of conspiracy did not reach the level of a "sham." *Oberndorf II*, 696 F.Supp. at 560. In the case at bar, defendants' acting pursuant to the urban renewal statutes and the lack of allegations of a "sham" are similar to *Oberndorf II*. Accordingly, the federal antitrust claims against the City defendants are dismissed.

### B. Defendants Masiello, and DeLisle (in their individual capacities)

■ Plaintiff has sued defendants Masiello and DeLisle in their individual capacities as well as their official capacities. However, plaintiff's complaint focuses on decisions taken by them in their roles as City officials. In *Fisichelli v. City Known as Town of Methuen*, 956 F.2d 12, 15–16 (1st Cir.1992), then Chief Judge Breyer explained that a plaintiff cannot "avoid the ruling of *Columbia[v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) ] simply by substituting, for the name of the town, the names of the town officials who approved the challenged municipal action." As such, I conclude that the actions of which plaintiff complains "are actions taken by a municipal authority, and, for antitrust purposes, they amount to 'an authorized implementation of state policy.'" *Fisichelli*, 956 F.2d at 16 (citing *Columbia*, 499 U.S. at 370, 111 S.Ct. 1344). Therefore, plaintiff's federal antitrust claims against defendants Masiello and DeLisle in their individual capacities are dismissed.

### C. Defendants Peterson, Penman, James, and Anderson

■ Inasmuch as the City defendants had the authority to act in an anticompetitive manner, the private sector defendants (Peterson, Penman, James, and Anderson) acting in concert with them are also entitled to state immunity. *See Cine 42nd Street*, 790 F.2d at 1048.

Furthermore, the actions of the private sector defendants are protected from federal antitrust law under the *Noerr–Pennington* doctrine, which is the "corollary to *Parker*." *Columbia*, 499 U.S. at 379, 111 S.Ct. 1344. *Noerr–Pennington* is a corollary doctrine because *Parker* "did not purport to immunize from antitrust liability the private parties who urge them to engage in anticompetitive regulation." *Id.*

■ *Noerr–Pennington* is derived chiefly from three Supreme Court decisions: *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, *reh'g denied*, 365 U.S. 875, 81 S.Ct. 899, 5 L.Ed.2d 864 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). *Noerr–Pennington*'s general principle is that "[t]he federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *Id.* at 379–80, 92 S.Ct. 609.

■ In the case at bar, *Noerr–Pennington* protects the private sector defendants from federal antitrust liability. Attempts to influence governmental action are immune from antitrust liability under the doctrine even when undertaken for anticompetitive purposes. *Miracle Mile Associates v. City of Rochester*, 617 F.2d 18, 20 (2d Cir.1980). Plaintiff's complaint only alleges that the pri-

vate sector defendants entered into an agreement with the City defendants that, at most, could be considered successful lobbying activity. While plaintiff uses the words "conspiracy," "restraint of trade," and "monopoly" in its complaint, no facts are presented other than the entering into of an agreement. No bad acts are alleged, and no fraud is alleged. "[A]ssuming *arguendo* that the agreement between the City and the Developers restricts competition, they are immune from liability under the antitrust laws." *Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 269 (2d Cir.1990).

Furthermore, the "sham exception" to the *Noerr–Pennington* doctrine, which would overcome *Noerr–Pennington* immunity, does not apply to invalidate the actions of the private sector defendants in the case at bar. A 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all, *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n. 4, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), not one who "genuinely seeks to achieve his governmental result, but does so *through improper means, id.*, at 508, n. 10, 108 S.Ct. 1931 (quoting *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 827 F.2d 458, 465, n. 5 ( [9th Cir.] 1987))." *Columbia*, 499 U.S. at 380, 111 S.Ct. 1344.

In *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the Supreme Court held "that a 'conspiracy' exception to *Noerr* must be rejected." *Id.* at 383, 111 S.Ct. 1344. While a jury had found that the defendant billboard company had conspired with the City of Columbia to keep the plaintiff, a rival, out of the city, the District Court granted defendants' motions for judgment notwithstanding the verdict. The Court of Appeals reversed and reinstated the verdict. The Supreme Court reversed the Court of Appeals and explained:

> Insofar as the identification of an immunity-destroying "conspiracy" is concerned, *Parker* and *Noerr* generally present two faces of the same coin. The *Noerr*-invalidating conspiracy alleged here is just the *Parker*-invalidating conspiracy viewed from the standpoint of the private-sector

participants rather than the governmental participants. The same factors which, as we have described above, make it impracticable or beyond the purpose of the antitrust laws to identify and invalidate lawmaking that has been infected by selfishly motivated agreement with private interests likewise make it impracticable or beyond that scope to identify and invalidate lobbying that has produced selfishly motivated agreement with public officials.

*Id.* at 383, 111 S.Ct. 1344.

In the case at bar, even viewing the facts and allegations in a light most favorable to plaintiff, the actions of the private sector defendants are protected by the *Noerr–Pennington* doctrine because their actions, at most, were aimed at procuring favorable government action. Accordingly, the federal antitrust claims against the private sector defendants are dismissed.

## II. Plaintiff's State Law Claims

The City defendants assert that plaintiffs state law claims are based on the same facts and circumstances as its federal antitrust claims. They also aver that "the Donnelly Act is modeled on and governed by the same standards as the federal antitrust laws." *Music Center v. Prestini Musical Instruments Corp.*, 874 F.Supp. 543, 555 (E.D.N.Y. 1995).

However, "[t]his circuit has not gone so far as to apply the *Noerr–Pennington* doctrine to state law causes of action." *Suburban Restoration Co., Inc. v. ACMAT Corp.*, 700 F.2d 98, 101 (2d Cir.1983). In *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), the Supreme Court "announced that when all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them *without* prejudice." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90 (2d Cir.1998) (quoting *Carnegie–Mellon*, 484 U.S. at 350, 108 S.Ct. 614). Thus, under 28 U.S.C. § 1367(c)(3), this court declines to exercise supplemental jurisdiction over the state law claims. *See*

*id.* Therefore, plaintiff's state law claims are also dismissed, without prejudice.

### *CONCLUSION*

Based on the foregoing, defendants' motions to dismiss (Items 11, 14, 16) are granted. Plaintiff's motion for a preliminary injunction (Item 3) is denied as moot. Accordingly, the complaint is dismissed, and the Clerk is ordered to enter judgment for the defendants.

So ordered.